357 So.2d 172 (1978)
In re INQUIRY CONCERNING A JUDGE, J.Q.C. No. 77-16.
No. 51238.
Supreme Court of Florida.
March 16, 1978.
Rehearing Denied April 4, 1978.
*174 John R. Asbell of Asbell, Hains & Doyle, Naples, William C. Clark, Vice-Chairman, West Palm Beach, and John T. Wigginton, Gen. Counsel, Tallahassee, for Fla. Judicial Qualifications Com'n, petitioner.
Daniel S. Dearing of Daniel S. Dearing Law Offices, Tallahassee, for Judge David L. Taunton, respondent.
PER CURIAM.
We have for consideration the petition of David L. Taunton, County Judge of Gulf County, Florida, in which we are asked to reject the Findings of Fact, Conclusions of Law and Recommendations of Discipline filed on August 25, 1977, by the Florida Judicial Qualifications Commission.[1] We have jurisdiction by virtue of Article V, Section 12, Florida Constitution.
Having found probable cause to exist to believe that Judge Taunton had committed certain described acts of judicial misconduct, the Florida Judicial Qualifications Commission instituted formal proceedings against him. The Notice of Formal Proceedings directed to Taunton contained ten counts of judicial misconduct. After hearing, the Commission found Judge Taunton to be not guilty of the conduct alleged in Counts III, V and VI and struck Counts II and X. As to the remainder of the counts, the Commission found Taunton guilty as charged and, thereby, guilty of violating Canons 2 A, 2 B, 3 A(4), 3 A(6), 3 B(2), 4 B and 5 A, and recommended his removal from office.
Count I charged that Taunton prepared a motion for change of venue and mailed it to various defendants with directions on filing and an opinion as to the validity of the motions; that he knowingly, intentionally *175 placed himself in a position whereby his impartiality toward a case before him could be questioned and in which his recusal was required; that he believes his actions were proper; and that he intends to continue to act according to his own standards. Count IV charged that in an effort to promote his personalized concept of justice, he and others employed by him conducted investigations, during office hours, for his own purpose and unrelated to his judicial duties, into the conduct of certain local officials; that in the course of those investigations, he made long distance telephone calls at county expense; that he made a speech publicly accusing several residents of Gulf County of illegal conduct. Count VII charged that James Austin was convicted in Judge Taunton's court of driving under the influence of alcohol, and an appeal was taken; that Judge Taunton volunteered to, and did, appear as a character witness for James Austin, without necessity of a subpoena, before a hearing examiner for the Department of Highway Safety and Motor Vehicles. Count VIII charged that while presiding in the case of West Fla. Gas Co. v. Mattie Mae Hill, Judge Taunton, although agreeing that defendant was delinquent in her payments, refused to issue the writ of replevin requested by plaintiff; that he agreed to pay the amount owed by Mattie Hill if she was unable to pay the same; and that he gave his brother money to give to Mattie Hill so that she could pay the balance due on the claim but refused to require defendant to pay for the cost of the action. Count IX charged that in the case of U.S. Credit Life Corp. v. Ralston Lynch, pending before Judge Taunton, a plan was reached and approved by the parties and Taunton whereby defendant was to pay plaintiff $66.00 per month; that defendant failed to make payment in September, October and November; that plaintiff, as required by Judge Taunton, filed with the court an amount due affidavit; that without notice to plaintiff, Taunton spoke with defendant in his office relative to defendant's inability to pay; that Taunton refused to execute the final judgment because of defendant's financial difficulties; and that he feels compelled to consider the hardship, if any, on a defendant in determining whether or not to enter final judgment.
Judge Taunton, through counsel, questions the procedures before the Judicial Qualifications Commission and asserts that they lacked the elements of fundamental fairness and due process. We have reviewed the record, considered each of his complaints as to the procedure and conclude that his objections are without merit.
The Commission, at a meeting on February 18, 1977, determined that probable cause existed to believe that respondent was guilty of having committed acts of judicial misconduct. Thereafter, on March 4, 1977, a Certificate of Probable Cause was mailed to Judge Taunton, and on March 7, 1977, a Notice of Formal Proceedings was served on him. The hearing was conducted on and after June 20, 1977. The period of approximately three and one-half months between the service of notice and the commencement of hearing provided ample time to retain counsel and prepare a defense to the charges.
We find that Judge Taunton suffered no prejudice by the action of the Judicial Qualifications Commission in amending the Notice of Formal Proceedings on April 26, 1977, for the purpose of adding three counts, nor was he prejudiced by the granting of counsel's ore tenus motion to delete a phrase from Count III, paragraph 13, during the hearing. The first amendment was permitted by Fla.Jud.Qual. Comm'n Rule 17, and the Judge was given reasonable time both to answer the amendment and to prepare and present his defense. The finding of not guilty as to Count III eliminated any question as to the authority or propriety of the Commission's action in permitting the amendment to Count III after the Commission counsel had rested his case.[2]
*176 On May 12, 1977, before Judge Taunton had filed his answer to the amended Notice of Formal Proceedings, and four days before the answer was due, the Commission set the formal hearing for June 20, 1977. Fla.Jud.Qual.Comm'n Rule 11(a) provides that "after the filing of an answer or the expiration of the time for its filing, the commission shall order a hearing..." We hold that the premature filing of the Notice of Hearing sub judice was a harmless error.[3]
In every Judicial Qualifications Commission proceeding, the respondent judge is guaranteed the right and reasonable opportunity to be represented by an attorney. Fla.Jud.Qual.Comm'n Rule 16. Judge Taunton contends that he was effectively denied his right to counsel when the Commission denied his motion for a continuance, which motion was filed on his behalf on May 23, 1977. The motion recites that counsel agreed to represent Judge Taunton on April 28, 1977; that counsel had conflicting court engagements on June 20 and 21, 1977; that requests for postponement of the conflicting engagements would not be favorably received; and that even though the conflicts could be reconciled, there was insufficient time between the date of retention of counsel and the date of the scheduled hearing to permit proper preparation for the hearing. The Commission denied the motion on May 25, 1977. This Court refused to grant a stay on June 15, 1977, and Judge Taunton proceeded to hearing without representation.
We agree with respondent that the right to counsel is extremely important in proceedings before the Judicial Qualifications Commission. In re Kelly, 238 So.2d 565 (Fla. 1970). He accurately stated one of the reasons why he should not have proceeded pro se when he stated at the beginning of the formal hearing:
"An additional problem is presented by being cast in dual roles in this procedure  the role of counsel and the role of defendant. As counsel, it will be necessary at times for me to be disagreeable and aggressive and no doubt I will stumble and blunder many times. What has been very well said, he who represents himself has a fool for a client. Not being a lawyer and having no experience in this role I find myself in today amplifies this predicament. My concern is this: Can the Members of this Commission distinguish between David Taunton the blundering counsel and David Taunton the defendant. Consequently will the verdict be cast as judgment in both roles."
Respondent was not deprived of his right to counsel. He simply did not retain counsel who could arrange his schedule to be able to represent him. Although Judge Taunton is not a lawyer,[4] he has extensive, formal, non-legal education, and he has studied the law formally and in connection with his judicial duties. At the time of the alleged offenses and throughout the Commission proceedings, he was a duly-elected and fully-qualified county judge. He was subject to the Code of Judicial Conduct and was within the jurisdiction of the Commission. *177 He was charged with knowledge of the applicable rules, including the rules which provide his right to counsel.
Given these facts and in consideration of the time that was available to the Judge to retain counsel, we conclude that the Commission did not abuse its discretion in denying the requested continuance and the respondent was not effectively deprived of counsel through action of the Commission.
Respondent's contentions with respect to the place of his hearing, the dual role of the presiding officer and the absence of an opportunity to refute or explain his actions before the amended notice was filed are also without merit. The Commission was in substantial compliance with its procedural rules, and no deviation therefrom was serious enough to deprive this respondent of due process or a full and fair hearing.
The testimony and exhibits received by the Commission support the findings that Judge Taunton knowingly and intentionally placed himself in a position whereby his impartiality could be questioned; that he misused the administration of his office contrary to the Code of Judicial Conduct; that he improperly used the public telephone and copying facilities; that he did not reimburse the County for expenses incurred and supplies used; that after revoking driving privileges of a defendant in a case before him, he voluntarily appeared before a hearing officer in support of a petition for reinstatement of the privileges; that he refused to issue a writ of replevin and refused to assess costs after supplying the money to pay the principal amount claimed by the plaintiff; and that he conducted ex parte conferences with a defendant in a case before him and refused to execute judgment against him. The Commission's findings that Judge Taunton opted to follow his own conscience when it conflicted with the Code of Judicial Conduct and that he will perform his future duties on that basis are likewise supported by the record.
Although no single charged offense standing alone would warrant punishment, the combination of the specified activities and the respondent's unwillingness or inability to make his future conduct conform to the rules of law and canons of ethics is sufficient to support a recommendation of discipline. The Court announced this principle in its review of the first proceeding of the Judicial Qualifications Commission, In re Kelly, supra, wherein it was held:
"Conduct unbecoming a member of the judiciary may be proved by evidence of specific major incidents which indicate such conduct, or it may also be proved by evidence of an accumulation of small and ostensibly innocuous incidents which, when considered together, emerge as a pattern of hostile conduct unbecoming a member of the judiciary. The record in this case clearly reflects a pattern of petitioner's hostility toward many attorneys, court officials, and fellow judges, as well as a concerted effort to pamper the public and news media by press releases designed to bolster his personal image at the expense of the judiciary. This is conduct unbecoming a member of the judiciary."
This case is particularly difficult because it appears that Judge Taunton was motivated by his own sense of right and wrong and his concern and compassion for the poor and underprivileged. His motives appear to be wholesome and unselfish, and his actions seem to have been calculated to be helpful and charitable. At the bar of this Court, during oral argument, counsel for the Judicial Qualifications Commission was complimentary of the respondent as a person and said of him, "I think it is clear from the record that his compassion for people and for the poor override his understanding, or what should be his understanding, of his judicial duties."
In the interest of protecting and preserving a strong and independent judiciary, we must be careful never to judge a respondent and determine whether to remove him from office on the grounds that he possesses an unpopular philosophy, has offensive idiosyncrasies, has rendered unpopular *178 decisions or is too compassionate. Unless his attitudes, prejudices or beliefs are translated into action or inaction that constitutes a violation of law or the Code of Judicial Conduct, rendering him presently unfit to hold the office, he should be free to make his decisions and administer his office without fearing an investigation by the Commission that could lead to removal from office.
Every judicial officer is the sum of his past. When he dons his robe and ascends to the bench, he is not divested of the effects of his previous training, education and real life experiences. He takes his official office as a human being, not as a judicial robot. As a human being, he is subject to human strengths and weaknesses; he will have adopted firm ideas and developed a conscience. We do not ask that he abandon those accumulated individual qualities so that he might conform to some predetermined norm. He may bring his past experiences, beliefs and sense of justice to bear on the decisions he is required to make. Every judicial officer is granted broad discretionary powers, and one of the great strengths of our system is the carefully guarded right to exercise independently those powers.
We have traditionally tolerated differences of opinion and variations in philosophy among judicial officers. Strong minority views expressed by members of the judiciary do not constitute grounds for disciplinary action, although they may bring on criticism. Professor James R. Kerr recently reviewed the judicial career of the late United States Supreme Court Justice Frank Murphy and said:
"He was always concerned with the human dimension of cases before the Court and had a heightened quality of empathy and sensitivity to the litigants who could be called underdogs. These attitudes colored his opinions and critics claimed that he acted on the basis of his own conscience and sense of fairness, rather than on the basis of respect for and perpetuation of judicial proprieties and conventions...."[5]
Justice Ervin, dissenting from the majority opinion in Dixon v. State, 283 So.2d 1 (Fla. 1973), was critical of Florida's death penalty statute and the opinion upholding its constitutionality. Articulating his own attitude and commenting on the prevailing legislative and judicial motivation, he observed:
"It is our duty as judges sworn to uphold the nation's constitution to apply national constitutional standards with clinical objectivity in this matter, without catering to popular clamor or the vagaries of provincialism, local pressures, emotion or passion.
.....
"In our pecuniary culture the rage to emulate status by invidious comparison on bases of wealth or one's cunning ability to get more and spend more than his neighbors, causes us to constantly downgrade or become callous to the value of humanitarian principles.
.....
"Because of our overdrawn servility to the concepts of economic status and our personal standing in those respects, we are inclined to be callous to the virtues of compassion and refuse to take slower paces for the correction of human ills through education and rehabilitation. These more enlightened alternatives are not harsh or speedy enough to suit our atavistic sense of vengeance or our passions, or to calm our imagined fears of threats to our pecuniary society or to abate our belief that extreme deterrents are necessary."
There will not be an independent, effective judiciary if we expect all judges to fit a common mold or encroach upon their discretionary powers by instituting disciplinary proceedings against those who deviate in some minor way from the model constructed by the members of the Judicial Qualifications Commission. In a forceful dissenting opinion in State ex rel. Turner v. Earle, *179 295 So.2d 609, at 621 (Fla. 1974), Justice Ervin cautioned:
"The Commission should never be unmerciful or Draconian. Nor should it take a Pecksniffian or crusading stance. Pecadillos [sic] of a judge should be ignored by the Commission unless they cumulatively reflect upon the present quality of his judicial service or render him an object of disrespect and derision in his role to the point of ineffectiveness...."
And, in a historic proceeding in which the Florida Senate acquitted Circuit Judge Richard Kelly of impeachment charges, counsel for Kelly articulated the concern we must all have for the independence of the judiciary:
"Our primary responsibility is to Richard Kelly, but I think, in a larger sense, that we have a responsibility to the entire judiciary of the State of Florida. The proposition that is before you in these proceedings involves every judge, sitting in every court in the State of Florida, and that proposition is simply this:
"Must a judge render decisions on the basis of the influence of the lawyer involved? Must a judge curry favor with the Bar that practices before him, or risk impeachment, risk being discharged from his office, risk public disgrace and humiliation, or can he make his decisions independently, as an independent judiciary was intended to make them?
"Now, gentlemen, I think, also, in a larger sense, every citizen of the State of Florida is a participant in these proceedings because, when the independence of the judiciary is diminished, it diminishes all of us. The very foundation of all our liberties and all our rights depends upon an independent judiciary, which is not subject to prejudice by lawyers, litigants, or from any other source."[6]
There are, of course, limits that every judicial officer must observe. Judges are required to follow the law and apply it fairly and objectively to all who appear before them. No judge is permitted to substitute his concept of what the law ought to be for what the law actually is. He may exercise his judicial discretion conservatively or liberally, and he may temper justice with mercy, but he may not deny justice to any person. He may not withhold justice from one litigant in favor of another for whatever reason. Every judge is answerable for excesses or abuse of his awesome power. There is no place in our system for justice by whim or capricious notion. Regardless of the philosophy to which a justice or judge subscribes, he is not permitted to conduct himself in a manner which is unbecoming to a member of the judiciary and which demonstrates an unfitness to hold office.
Justices and judges are integral parts of the system by which people are governed. Restraints on those invested with power to govern are essential. As James Madison said:
"If men were angels, no government would be necessary. If angels were to govern men, neither external nor internal controuls on government would be necessary. In framing a government which is to be administered by men over men, the great difficulty lies in this: You must first enable the government to controul the governed; and in the next place, oblige it to controul itself. A dependence on the people is no doubt the primary controul on the government; but experience has taught mankind the necessity of auxiliary precautions."[7]
Judge Taunton, found guilty of conduct unbecoming a member of the judiciary because he violated specific canons of the Code of Judicial Conduct, surely places this Court in the very situation in which he found himself on occasion. We are invited to suspend our judicial obligations under the Code, look to his good intentions and *180 overlook completely his transgressions. From the record, there is no doubt that he would feel free to adopt just that approach. We cannot, if we are to preserve our concept of justice, condone the conduct of Judge Taunton and announce to the judiciary of this state that we will not impose discipline upon judicial officers for conduct that demonstrates a present unfitness to hold judicial office if it is our opinion that the judge is a good person who acted with the personal belief that he was doing the proper thing. If we follow such a course in Judge Taunton's case, in which he was motivated by compassion, we would be obliged to condone the same judicial misconduct brought about by the opposite emotion if the subject judge were to have acted in the belief that he was right. There can be no condonation of judicial failure to follow the law or failure to obey the impartiality and objectivity required by the Code of Judicial Conduct, whether the judge be tough, tender or something in between. Rather, we are obliged to uphold the prohibition against advocacy prescribed in the Code of Judicial Conduct and require that all judicial officers obey its precepts as well as the law, and make clear to all who have business before our courts that they can expect equal justice and fair treatment regardless of station in life.
Relying on In re Boyd, 308 So.2d 13 (Fla. 1975), respondent contends that he cannot be removed from office unless there is clear and convincing evidence, free of substantial doubts or inconsistencies, that he was guilty of a serious and grievous wrong and that he committed it with a corrupt motive. He asserts that the record reflects that in every instance, he was guided only by a sincere concern for carrying out his duties, not by any motive of personal advancement. In that case and in In re Dekle, 308 So.2d 5 (Fla. 1975), the rule cited by respondent was established and was the controlling rule when Judge Taunton failed to comply with the Code. The people of Florida, in November of 1976, adopted an amendment to Article V, Section 12(f), Florida Constitution, which added the following sentence: "Malafides, scienter or moral turpitude on the part of a justice or judge shall not be required for removal from office of a justice or judge whose conduct demonstrates a present unfitness to hold office."[8] The amendment invalidates the prior rule as of the effective date of the amendment. A judicial officer may now be removed from his office if it is determined that his conduct demonstrates a present unfitness to hold office, even though his motives were good and wholesome.
We agree with respondent that the record is devoid of evidence of corruption or corrupt motive on his part. We note that all of the activities for which he is to be disciplined took place before the effective date of the amendment to Article V, Section 12(f), Florida Constitution, and at a time when such activities, without corrupt motive, would not warrant his removal from office. We are, therefore, confronted with the question of whether the 1976 constitutional amendment may be applied retroactively to transform his improper, but non-corrupt, conduct into grounds for removal after the fact.
The prohibitions of ex post facto laws in Article 1, § 9, Clause 3, of the Constitution of the United States and Article I, Section 10, of the Florida Constitution apply only to laws prescribing criminal penalties; they would not prevent the retroactive application of the 1976 constitutional *181 change to Judge Taunton's case. Surf Club v. Tatem Surf Club, Inc., 151 Fla. 406, 10 So.2d 554 (1942).
Proceedings authorized by Article V, Section 12, Florida Constitution, for judicial discipline are not criminal proceedings, but we have held, and do here affirm, that an accused judicial officer is to be accorded both substantive and procedural due process of law. He may not be removed from office unless his constitutional rights are protected. In In re Kelly, supra, the Court opined:
"The proceeding before the Commission lacks the essential characteristics of a criminal prosecution. The object is not to inflict punishment, but to determine whether one who exercises judicial power is unfit to hold a judgeship. The Commission, created by the Constitution as an arm of this Court, is authorized to conduct a hearing for the purpose of aiding this Court in determining whether a judge is unfit or unsuitable. Under the provisions of the Constitution this Court may exclude from the judiciary those persons whose unfitness or unsuitability bears a rational relationship to his qualifications for a judgeship, so long as the adjudication of unfitness rests on constitutionally permissible standards and emerges from a proceeding which conforms to the minimum standards of due process... ."
Due process, guaranteed by Article I, Section 9, Florida Constitution, contemplates notice that an act is a removable offense at the time it is committed. Any other conclusion would expose judicial officers to the unfair and untenable situation in which even innocent acts of today could someday be declared improper and subject them to punishment or removal from office. We cannot approve a rule that would permit a review of every judge's past conduct each time a change in the law occurs to determine whether innocent conduct of the past has been converted into grounds for discipline under the new law. Judicial officers are justified in relying on the current rule and in conducting themselves accordingly. We, therefore, hold that the amendment to Article V, Section 12(f), has only prospective application.
Judge Taunton engaged in conduct unbecoming a member of the judiciary. That conduct would be grounds for removal if it had taken place after the effective date of the 1976 amendment to Article V, Section 12(f). A continuation of the improper conduct, which Judge Taunton indicated will be his future practice, will be judged in light of the current provisions of our constitution and will subject him to possible removal, notwithstanding his good intentions and compassionate motives.
Accordingly, we approve the Findings of Fact and Conclusions of Law of the Florida Judicial Qualifications Commission but decline to order Judge Taunton's removal from office. For the reasons stated and because of his conduct, we publicly reprimand him.
It is so ordered.
ADKINS, ENGLAND, SUNDBERG, HATCHETT and KARL, JJ., concur.
OVERTON, C.J., concurs with an opinion.
BOYD, J., concurs specially with an opinion.
OVERTON, Chief Justice, concurring.
Rich or poor, claimant or defendant, the parties in a court case are each entitled to an impartial judge. A former Chief Justice of this Court has summarized the obligation of the judiciary to be:
... [T]he judiciary has ever been the poor man's shield against oppression, the rich man's defense against the mob, and though the reformer may wince under the law's restraints, it is his only recourse for justice if he permits blind passion to enmesh him in its clutches. It will save the minority from the tyranny of the majority and protect both from the ruthless hand of the demagogue. It is the saving quality that will make this *182 government one of laws and not a government of men.[1]
When a judge becomes personally involved or takes sides in a court case, he ceases to be objective and in fact has become an advocate. Having lost his impartiality, he clearly cannot judge the matter fairly. This statement does not mean that a judge should not make inquiries of the parties or witnesses.
Judges in many instances must make inquiries to seek the truth, but this must be done objectively and not as an advocate for one side or the other. The requirement in the Code of Judicial Conduct that "[a] judge should perform the duties of his office impartially"[2] is basic to our system of jurisprudence. Lawyers fully understand the absolute need for this requirement. Regrettably, this nonlawyer judge had not even read the Code of Judicial Conduct until this proceeding and apparently from this record still does not understand the need for impartiality. He apparently sees no problem in taking sides in a court case or being an investigator for law enforcement. In both instances he has become an advocate.
The investigation of wrongdoing is a law enforcement function of the executive branch of our government. It is not a judicial function. If a matter of wrongdoing or misconduct comes to the attention of a judicial officer, he should bring it to the attention of the appropriate official of the executive branch, whether it be the sheriff, the state attorney, or the Governor. A judge cannot be both an investigator and an impartial trier of the facts or law.
Judge Taunton broke the cardinal rule of impartiality and defends himself on the grounds that he had good motives. He fails to understand that our court system cannot work if the judge becomes an advocate for one side or the other, whatever his motive.
I fully concur in the judgment of the majority. This case illustrates the problem of a nonlawyer assuming the position of a judicial officer with no training in its responsibilities. I trust that this experience by Judge Taunton impresses upon him the absolute need for a judge to be impartial. Without that, our system cannot work.
BOYD, Justice, concurring specially.
I concur in the majority view publicly reprimanding respondent for his misuse of judicial office. Although he apparently was sincere in his efforts, his personal views of how to conduct the office of county judge conflicted with Canons of Judicial Ethics evolved over hundreds of years.
The most basic concept of judicial ethics is that judges must be objective and impartial. This entire record demonstrates an admitted tendency to favor defendants over plaintiffs when poor people are being sued. Compassion is a good judicial attribute, unless it is used to prevent parties from having their rights exercised in courts.
It is an elementary principle that criminal court judges should not use the influence of their offices to make public speeches charging persons with crimes or other misconduct. If they are dissatisfied with performance by other officials they may vacate their judicial posts and oppose them politically. When judges take public positions on matters which may come before them they are required to recuse themselves on those issues, but after making such attacks the question arises whether they can objectively try other matters involving such persons.
The record shows respondent spent taxpayers money to investigate many public officials, using his court secretary for that purpose. After gathering data from public records, he notified State news media of his *183 charges and then spent over an hour at a crowded County Commission meeting denouncing public officials. The statements were made in a County courtroom in which criminal justice is dispensed. He later attacked the Grand Jury called to investigate the charges as improperly constituted and charged the State Attorney and presiding judges with prejudice. The Grand Jury cleared the public officials, but the harm done to them personally and to public confidence in government could not be erased by the Grand Jury's findings.
The majority opinion relies on In Re Dekle and In Re Boyd. To determine whether to rely upon those cases as precedent, the Court should consider results attained by other governmental forums considering substantially the same issues. The public records show that while the allegations were being made, Boyd was reelected in September 1974, and a Select Committee of the House of Representatives found no basis for legislative disciplinary action against him in May 1975. When Dekle subsequently retired he reestablished a successful law practice.
The majority is correct in holding respondent should be judged by judicial standards existing at the time of his misconduct.
Respondent is not a member of the Bar and had not read the Canons of Judicial Ethics until this proceeding began. He says he will continue to conduct his office the same as in the past and would rather not be a judge than to reform his unorthodox methods. If he were willing to learn and observe the Canons of Conduct our problem would be over. It seems obvious he will likely be again before the Judicial Qualifications Commission.
The majority has concluded respondent cannot be removed for the conduct mentioned herein because, at that time, a corrupt motive was required for removal. At this time, repetition of the same conduct could result in removal. He has said he has no intention of changing his activities.
For the above reasons I concur with the majority in reprimanding respondent and would request the Judicial Qualifications Commission to monitor his present and future activities.

ORDER
Petition for rehearing is denied. Texas Co. v. Davidson, 76 Fla. 475, 80 So. 558, State v. Green, 105 So.2d 817 (Fla. 1st DCA 1958).
It is so ordered
NOTES
[1] The petition was filed pursuant to Fla.Jud.Qual.Comm'n Rule 23.
[2] On May 12, 1977, this Court, in In re Rules of the Florida Judicial Qualifications Commission, 346 So.2d 70 (Fla. 1977), repealed Fla.Jud.Qual. Comm'n Rule 17 in its entirety and observed:

"We appreciate the need for a rule as to pleading amendments during the course of a Commission proceeding, but the second sentence of the rule confers more authority than is required. That sentence reads:
`The Notice may be amended to conform to proof or to set forth additional facts, whether occurring before or after the commencement of the hearing.'
Given the investigative resources of the Commission, there is little necessity and great potential harm in a rule which allows the Commission to set forth additional facts by amendment to the formal charges after the Commission has conducted its hearing and the charges have been filed with this Court, made public, and relied upon by the justice or judge to prepare his or her defense."
[3] Fla.Jud.Qual.Comm'n Rule 11(a) assures the parties a reasonable time for preparation for the formal hearing. A premature Notice of Formal Hearing that does not allow such a reasonable period could prejudice both the Commission and respondent. Sub judice, the rule violation was minimal and non-prejudicial.
[4] For a discussion of the role of non-lawyer county judges and an official report to the Court on the structure and conduct of the non-lawyer county judge training program, see Treiman v. State ex rel. Miner, 343 So.2d 819 (Fla. 1977).
[5] James R. Kerr, "The Neglected Opinions of Mr. Justice Murphy," Detroit College of Law Review, Vol. 1977, No. 1, pp. 7-65, Spring 1977.
[6] From the remarks of B.J. Masterson, Esq., to the Florida Senate sitting as a court of impeachment on September 24, 1963, Fla.S. Jour. Court of Impeachment 387 (1963).
[7] Jacob E. Cooke (ed.), The Federalist, The World Publishing Company, Cleveland, 1961, p. 349.
[8] Art. V, § 12(f), Fla. Const., now provides in pertinent part:

"Upon recommendation of two-thirds of the members of the judicial qualifications commission, the supreme court may order that the justice or judge be disciplined by appropriate reprimand, or be removed from office with termination of compensation for willful or persistent failure to perform his duties or for other conduct unbecoming a member of the judiciary demonstrating a present unfitness to hold office, or be involuntarily retired for any permanent disability that seriously interferes with the performance of his duties. Malafides, scienter or moral turpitude on the part of a justice or judge shall not be required for removal from office of a justice or judge whose conduct demonstrates a present unfitness to hold office."
[1] Address entitled "The Judiciary and Democracy," given by Justice Glenn Terrell in St. Augustine, Florida (circa 1942). The speech is preserved among the papers of Justice Terrell in the Terrell Room of the Robert M. Strozier Library on the campus of Florida State University, Tallahassee, Florida. The quote is also included in a later essay by Justice Terrell entitled "The Judiciary in a Federal Republic" which appears in The Florida Handbook, p. 164, at p. 167 (Allen Morris, 3rd ed. 1952).
[2] Canon 3, Code of Judicial Conduct.