417 So.2d 950 (1982)
In re INQUIRY CONCERNING A JUDGE, William C. GRIDLEY, Circuit Judge.
No. 60182.
Supreme Court of Florida.
May 13, 1982.
Rehearing Denied August 30, 1982.
*951 Richard C. McFarlain and David W. Spicer of McFarlain, Bobo, Sternstein, Wiley & Cassedy, Tallahassee, for petitioner.
Talbot D'Alemberte and Donald M. Middlebrooks of Steel, Hector & Davis, Miami, for respondent.
James C. Hauser, County Judge, Orange County, Orlando, for Executive Committee of County Court Judges, amicus curiae.
ALDERMAN, Justice.
The Florida Judicial Qualifications Commission has filed its recommendations with this Court that Judge William C. Gridley, Circuit Judge for the Ninth Judicial Circuit, be reprimanded for violating Florida Bar Code of Judicial Conduct, Canons 2 A, 2 B, and 5 A. These recommendations are premised on its findings that Judge Gridley is guilty as charged in counts 1 and 2 of the formal charges filed against him by the Commission. Judge Gridley, in response to our order to show cause as to why the Commission's recommended action should not be taken, requests that we reject the Commission's recommendations. He argues that the conduct delineated in count 1 does not constitute a basis for imposition of sanctions, that the publications alluded to in count 2 do not constitute a violation of the canons of judicial conduct, that he was denied due process by the Commission's acting as both the investigator and recommending body, and that the Commission conducted its deliberations as to guilt or innocence and as to sanctions in private. We agree only with Judge Gridley's assertion that the conduct charged in count 2 did not amount to a violation of the Code of Judicial Conduct.
Count 1 of the formal charges relates to Judge Gridley's personally injecting himself as an advocate into the case of Darrell Farmer. Judge Gridley recognizes that he acted improperly in this matter but suggests that since he acted without corrupt motive and solely with the interest of correcting what he perceived to be an injustice, he should not be reprimanded for his conduct. A finding of corrupt motive, however, is not a prerequisite to the disciplining of a judge. In Re Inquiry Concerning a Judge, 357 So.2d 172 (Fla. 1978). Our concern is whether Judge Gridley failed to follow the requirements of impartiality and objectivity imposed by the Code of Judicial Conduct. In evaluating this question, we must view the entire sequence of events which led to this charge being filed against him.
The Commission made thorough findings of the facts underlying this charge. These facts are of persuasive force and should be given great weight. In Re LaMotte, 341 So.2d 513 (Fla. 1977). The Commission found:
(1) Judge William C. Gridley, a circuit judge, presided at the first degree murder trial of Darrell Farmer, Case No. 74-1518, which commenced on October 17, 1974. The jury returned a verdict of guilty as charged on October 18, 1974, and Judge Gridley immediately imposed a sentence of life imprisonment without the possibility of parole for a minimum period of twenty-five years.
(2) Upon the conclusion of the trial and sentencing, Farmer's family was advised by his privately retained attorney of the necessity to file a motion for new trial within four days from the rendition of the verdict if he intended to appeal the sufficiency of the evidence to support the verdict. This attorney was discharged from further representation and a timely motion for new trial was never filed.
(3) On November 15, 1974, Judge Gridley denied untimely motions for reconsideration of degree of guilt and reconsideration of judgment of acquittal. Farmer, through newly retained counsel, immediately appealed and, on November 22, 1974, filed a motion for post-conviction relief. This motion was argued and denied *952 on December 2, 1974, and the previous motions were re-argued at the same time although no motion for rehearing appears in the record.
(4) At the hearing on December 2, 1974, Judge Gridley expressed his concern about the legal barriers to allowing the court to rule on the merits of the motions by stating:
If this matter doesn't eventually get properly heard, this Court is concerned. I think that it needs to be heard and dealt with, and that merely based on a technicality of the attorney not filing it from within the fifteen days barring it from being heard would be an injustice in this case.
(5) From December 1974 to February 1975, Judge Gridley received three letters from members of Farmer's family in which they expressed their concern over his conviction. Judge Gridley filed each letter in the court file.
(6) Judge Gridley was transferred from the criminal division of the court by the chief judge on March 31, 1975.
(7) In April 1975, Farmer filed another motion for post-conviction relief alleging that, through no fault of his own, a motion for new trial was not filed on his behalf. Judge Gridley recognized that he had no jurisdiction to entertain the motion because Farmer's conviction was then on appeal and he denied the motion on May 16, 1975.
(8) On May 16, 1975, Judge Gridley entered written orders denying the motions he heard on December 2, 1974.
(9) In October 1975, Judge Gridley received a letter from Farmer. This was not placed in the court file until December 6, 1977.
(10) On December 3, 1975, Judge Gridley wrote to Farmer's attorney (copy to the state attorney) requesting transcriptions of the post-trial proceedings and again expressing his problem with the jurisdictional aspects of the case. He wanted the hearings "transcribed for purposes of the record" because "... it would be beneficial to the justice of this case and to the continuing development of the law in this area." The attorney complied with the request and Judge Gridley ordered the cost thereof to be paid by the county.
(11) In early 1976, Farmer's conviction and sentence were affirmed on appeal. After the appeal was final, Judge Gridley, sua sponte, on March 17, 1976, filed a lengthy memorandum in the criminal court record to record his observations which potentially justified post-judgment relief... .
(12) Farmer filed another motion for post-conviction relief which was heard in December 1977 by another judge then presiding over the case. Judge Gridley, without subpoena, appeared and testified at the hearing. The motion was denied in January 1978 and a resulting appeal affirmed the denial in February 1978. In its opinion the Court of Appeal alluded to Judge Gridley's memorandum and stated in a footnote:
There is proof in the record that appellant was advised of the necessity for filing the motion, yet he discharged trial counsel and did not retain new counsel until it was too late.
(13) In March 1979, Judge Gridley received a letter from Farmer's family requesting that he write to the Governor on Farmer's behalf. This letter was not placed in the court file. Also in March 1979, Judge Gridley wrote to Farmer's attorney expressing his belief that a pardon for Farmer would be "especially appropriate in this case, and within the bounds of judicial ethics, he would be willing to contribute information and opinion" as to the appropriateness of such a pardon. He referred to his previous memorandum as covering most of what he could contribute. A copy of this letter was not placed in the court file.
(14) The Supreme Court denied certiorari in the Farmer case on October 11, 1979.
(15) In November 1979, Judge Gridley wrote directly to Farmer, who was then in prison, and sent copies of his letter to *953 Farmer's attorney and the Reverend George W. Farmer, Darrell Farmer's father. In the letter he expressed his wish to communicate with Farmer "as a person" and not in his judicial capacity although the letter was typed by his secretary on his official judicial stationery. He further expressed his belief that a pardon would be appropriate and he gave his assurance that he would provide the "highest and strongest recommendation" that Farmer be pardoned. A copy of this letter was not placed in the court file.
(16) In December 1979, Judge Gridley received a letter from the Reverend Farmer thanking the Judge for his interest in Darrell's case. This letter was not placed in the court file.
(17) In February 1980, Judge Gridley wrote to the Reverend Farmer advising that he had been "wrestling with Darrell's case off and on for a long time to try and figure out the best way to approach it to get just and proper relief for him (+ us!) from the no parole sentence he is under." He further suggested that Farmer retain the services of Chandler R. Muller, Esq., to represent Darrell "in an executive clemency proceeding or any other manner he deems appropriate." He stated: "Chan and I go to the same church and I have talked about Darryl (sic) with him. Don't worry about the money end of this representation. I imagine you have paid out a lot already and money is not going to be any barrier any more." The letter concluded, "Your brother in Christ, Bill." A copy was not placed in the court file.
(18) Also in February 1980, Judge Gridley wrote to Attorney Muller in which he summarized the trial and proceedings in the Farmer case and expressed his ideas about the case. He acknowledged that he would have reduced the degree of the conviction to second degree murder if he had been able to rule upon the post-trial motions on their merits, and further announced:
So, that's my epistle. At this point I may enter a non-jurisdictional order to the above effect. The other alternatives are a clemency proceeding or another Rule 1 or habeas corpus in Federal court. (Emphasis added.)
Thanks for looking into this matter. Let me know if you wish to represent Darryl (sic) or me!
(19) On March 4, 1980, Judge Gridley, with full knowledge that he had no jurisdiction to do so, entered a sua sponte order reducing Farmer's degree of guilt from first to second degree murder, ordering a pre-sentence investigation, and scheduling a resentencing hearing. He also indicated that he would not proceed further if the State objected by including in his order:
On an objection being filed by the State the court will delay any resentencing until further authorized by any appropriate proceedings.
After a petition for writ of prohibition was filed by the State with the Fifth District Court of Appeal, and after Judge Gridley's personal response thereto was filed, the Fifth DCA quashed the March 4, 1980, order.
(20) Judge Gridley conceded making two errors in his handling of the Farmer case.
These findings are supported by clear and convincing evidence. Taken singly, some of these actions may appear innocuous, but taking them in their entire context, we conclude that the Commission properly found that Judge Gridley did personally inject himself and his office into the matter as an advocate for Farmer, and in doing so he failed to conduct himself in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
Canon 2 provides:
A. A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
B. A judge should not allow his personal relationships to influence his judicial conduct or judgment. He should not *954 lend the prestige of his office to advance the private interests of others; nor should he convey or authorize others to convey the impression that they are in a special position to influence him. He should not testify voluntarily as a character witness.
Judge Gridley's course of conduct in the Farmer matter considered as a whole constitutes a violation of this canon. It is of utmost importance to the independence and integrity of the judiciary that a judge act impartially and avoid any appearance of impropriety. Contrary to this precept, Judge Gridley's conduct demonstrated partiality and gave the appearance of impropriety.
Count 2 of the formal charges is predicated on two letters to the editor written by Judge Gridley and published in the Orlando Sentinel Star and an article written by Judge Gridley and published in an Episcopal church newsletter. One of the letters expressed his views on Christian forgiveness, and the other expressed his view against capital punishment. His article in the newsletter discussed his views against capital punishment but made clear that he would do his duty as a judge and follow the law as written.
The Commission recommends that we find that this conduct violates Canon 2 A, requiring him to act in a manner that promotes public confidence in the integrity and impartiality of the judiciary, and Canon 5 A, permitting a judge to write, lecture, teach, and speak on nonlegal subjects, if these activities do not detract from the dignity of his office or interfere with the performance of his duties.
Judge Gridley argues that to penalize him for these utterings violates his first amendment right to free speech and alternatively argues that his particular conduct does not offend the Code of Judicial Conduct. We agree with this latter contention and therefore do not reach his free speech argument.
Although finding no violation of the canons in this case, we caution judges against indiscriminately voicing their objection to the law lest they be misunderstood by the public as being unwilling to enforce the law as written, thereby undermining public confidence in the integrity and impartiality of the judiciary. In In re Kelly, 238 So.2d 565 (Fla. 1970), cert. denied, 401 U.S. 962, 91 S.Ct. 970, 28 L.Ed.2d 246 (1971), we discussed responsible methods that could be utilized by a judge in expressing his views on law reform. We said:
There are many authorized methods of protest, dissent and criticism within the framework of the judiciary, such as the preparation of dissenting opinions, petitions to the Supreme Court for changes in the rules of procedure, submission of suggested changes to various committees of The Florida Bar, participating in the various legal seminars conducted by the Committee on Legal Education, or taking an active part in the state and local conferences of judges.
238 So.2d at 569. In our subsequent decision of In Re Inquiry Concerning a Judge, 357 So.2d 172 (Fla. 1978), we stated that differences of opinion and variations in philosophy among judicial officers are tolerated, and strong minority views expressed by members of the judiciary are not grounds for disciplinary action. But we stressed that there are limits that judicial officers must observe. We said: "Judges are required to follow the law and apply it fairly and objectively to all who appear before them. No judge is permitted to substitute his concept of what the law ought to be for what the law actually is." 357 So.2d at 179 (emphasis supplied).
There is no doubt that a judge in an appropriate forum may express his protest, dissent, and criticism of the present state of the law as long as he does not appear to substitute his concept of what the law ought to be for what the law actually is, and as long as he expresses himself in a manner that promotes public confidence in his integrity and impartiality as a judge. The manner in which Judge Gridley expressed his criticism of the death penalty is close to the dividing line between what is appropriate and what is not. Most judges, *955 we believe, would not have expressed their dissent in the same manner as Judge Gridley because, even if this conduct did not violate the Code of Judicial Conduct, they would have considered it to be in poor taste and subject to possible misinterpretation by the public. With the benefit of hindsight, it appears that today even Judge Gridley would consider more appropriate forums in which to express his dissent. Considering all of the circumstances of this case, however, we conclude that Judge Gridley did not violate the Code of Judicial Conduct in writing his two letters to the editor and publishing an article in an Episcopal church newsletter. The record in this case does not establish that his letters and article caused any disrespect for the law or his judicial office, interfered with the performance of his official duties, or resulted in a loss of public confidence in the integrity and impartiality of the judicial system. Judge Gridley made it clear that he was duty bound to follow the law and that he would do so although he did advocate law reform in the area of capital punishment.
In addition to challenging the bases for the Commission's findings that he violated the canons, Judge Gridley also challenges the procedure employed by the Commission. Although acknowledging that article V, section 12, Florida Constitution, allows the Commission to investigate and to recommend sanctions, he objects to the Commission's being both the accuser and the factfinding and recommending body and argues that this dual role of the Commission violated his right to due process of law. More specifically, he focuses on the participation in the hearing process of a commissioner who was intimately involved in the investigation and whose activities are a part of count 2. We have previously rejected this contention in In Re Kelly and have been shown no reason to recede from this decision. Judge Gridley was accorded all his due process rights during these proceedings.
Finally, Judge Gridley maintains that the recommendations of the Commission should be held to be void because its deliberations were held in secret. He contends that open deliberations as well as open proceedings are what is intended by article V, section 12(d), Florida Constitution, which provides in part:
Until formal charges against a justice or judge are filed by the commission with the clerk of the supreme court of Florida all proceedings by or before the commission shall be confidential; provided, however, upon a finding of probable cause and the filing by the commission with said clerk of such formal charges against a justice or judge such charges and all further proceedings before the commission shall be public. The commission may with seven members concurring recommend to the supreme court the temporary suspension of any justice or judge against whom formal charges are pending.
We disagree with Judge Gridley's interpretation of this constitutional provision. The provision that "all further proceedings before the commission shall be public" does not mean that the deliberations among the commissioners must be public. Just as judicial deliberations are confidential, so may be the deliberations of the Commission when it is deciding the guilt or innocence of a judge. Therefore, the recommendations of the Commission are not void as Judge Gridley suggests.
Accordingly, finding no merit to his objections relating to the findings and recommendations of the Commission with regard to count 1 and no merit to his constitutional challenges to the procedures employed by the Commission, we approve the findings of the Commission as to count 1 and its recommendation that Judge Gridley be found guilty of violating Canon 2 and that he be publicly reprimanded. Publication of this decision in Southern Reporter will serve as a public reprimand. Finding no violation of the canons by his conduct specified in count 2 of the formal charges, we hereby dismiss count 2.
It is so ordered.
ADKINS, BOYD and EHRLICH, JJ., concur.
*956 SUNDBERG, C.J., concurs specially with an opinion, in which ADKINS and EHRLICH, JJ., concur.
OVERTON, J., concurs in part and dissents in part with an opinion.
SUNDBERG, Chief Justice, concurring specially.
Although I concur in the Court's opinion in this proceeding, I must voice my reservation about one aspect of the opinion. The majority concludes that Judge Gridley's speaking out on the subject of the death penalty in the fashion which he did constituted no violation of the Code of Judicial Conduct. I agree. I also agree that judges should be circumspect in their public statements because of the special role of impartial arbiter which they play in our society. The judge must always guard against making public statements which compromise his impartiality or appearance of impartiality.
Nevertheless, I do not subscribe to the notion that the judge's forum is limited to those means of expression categorized in In re Kelly, 238 So.2d 565 (Fla. 1970), cert. denied, 401 U.S. 962, 91 S.Ct. 970, 28 L.Ed.2d 246 (1971), as suggested by the majority. The methods therein enumerated are limited to the judicial and legal communities. I believe judges, on occasion, may be obliged to speak out to a much larger community through other mediums. The efforts of members of this Court in support of the revision of Article V of our Constitution in 1972 and again in 1980 prove this assertion. There are times and issues which will compel judges to speak out in forums quite afield of those suggested in In re Kelly. I would not discourage fulfillment of that responsibility on their part.
ADKINS and EHRLICH, JJ., concur.
OVERTON, Justice, concurring in part, dissenting in part.
I fully concur in the majority's decision that Judge Gridley's course of conduct in the Farmer matter was a clear violation of the Code of Judicial Conduct, Canon 2. I strongly dissent, however, from the finding that the judge's course of conduct in publicly advocating the elimination of the death penalty did not interfere with the impartial performance of his duties and was not prohibited by the Code of Judicial Conduct. The fact that the comments of the judge deal directly with an issue which may come before him, in addition to the importance of the circuit judge's role in the death sentence process, gives me considerable concern about the impact of the majority's decision on our present Code of Judicial Conduct.
The instant conduct which I find improper took the form of two letters to the editor of the Orlando Sentinel Star and an article published in an Episcopalian church newsletter. I find that these publications have essentially destroyed Judge Gridley's image of impartiality in death penalty cases, a very sensitive area of his jurisdiction.
A circuit judge has an extremely critical position in our death sentence procedure, which is illustrated by the fact that, irrespective of the jury's recommendation or the desires of an appellate court, only a circuit judge can impose the death sentence. If the judge chooses not to do so, the state may not appeal that decision.
In my opinion, no reasonable person could read Judge Gridley's letters or article and still realistically believe that the judge would actually impose a death sentence, even if it was in accordance with a jury's recommendation. Even less realistic would be that the judge would override a jury recommendation of life and impose a death sentence in an appropriate circumstance as allowed by law. Assuming that Judge Gridley would, in accordance with his concluding remarks in the article, impose a death sentence where appropriate, his conduct in publishing the letters and article could adversely affect the death penalty process. For example, in Smith v. State, 197 So.2d 497 (Fla. 1967), defense counsel advised the defendant that the circuit judge before whom he was to appear had publicly spoken in opposition to the death penalty. Defendant and his counsel believed that the judge, because of those comments, would *957 impose a life sentence, and defendant accordingly entered a plea of nolo contendere. After the judge imposed the death sentence, defendant on appeal argued before this Court that the judge's public expression of his views on the death penalty had convinced him that he would receive only a life sentence. This Court rejected that claim, although it reversed on other grounds and allowed defendant to withdraw his plea.
Judge Gridley contends that his first amendment right to free speech protected his conduct, that the Code of Judicial Conduct affirmatively allows this type of conduct through which judges may advocate the improvement of the administration of justice, and that other circuit judges have expressed themselves concerning the death penalty, their statements being distinguished only in that they were in favor of rather than opposed to the death penalty. Judge Gridley points out that those judges have not been disciplined.
As to the first point, the judicial canons clearly state that judges may not advocate a position on matters which may come before them for decision. The reason is simple. In each adversary proceeding, at least two sides must have the opportunity to be heard. No party wishes to appear before a judge who is predisposed as to an issue unless, of course, he is predisposed in that party's favor. In my view, the first amendment rights of a judge are properly restricted by the judicial canons when those rights concern areas of the law in which the judge must reach a judicial decision. This is necessary to assure impartiality in the decision-making process. It is in fact a balancing test between the judge's constitutional right to free speech and the constitutional right of the litigants to due process and a fair trial. Under the circumstances of this case, given the sensitive and emotional nature of the proceedings and the critical position of the circuit judge, I find that the canons, as I construe them, do not improperly limit or infringe upon the judge's first amendment rights.
As to the second point, while the canons clearly and affirmatively suggest that judges should actively seek changes which improve the administration of justice, they do not grant a judicial officer a license to publicly project a strong impression of how he will rule in a particular matter. I find that Judge Gridley's actions travel beyond the scope of acceptable speech for the improvement of justice because they destroy his image of impartiality.
Finally, Judge Gridley claims that other judges who have participated in similar conduct favoring the death penalty have suffered no discipline. The inference is that Judge Gridley was prosecuted before the Judicial Qualifications Commission because he opposed the death penalty. I find both types of conduct improper, whether opposing or advocating the death penalty, and would expect equal administration of judicial discipline.
Our judicial system requires public support and confidence for its existence. Public support in turn depends upon judicial credibility, established in my view only by a clear appearance of judicial integrity and impartiality. The Code of Judicial Conduct was promulgated to furnish judges guidelines which, if followed, would assure that judges' conduct conformed to these standards.
I find that Judge Gridley clearly breached the letter and intent of the Code of Judicial Conduct. I would emphatically approve all the recommendations of the Judicial Qualifications Commission and publicly reprimand Judge Gridley accordingly.