DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**IVIN SPENCER,**
Petitioner,

v.

**STATE OF FLORIDA,**
Respondent.

No. 4D2025-0023

[September 3, 2025]

Petition for writ of prohibition to the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Cymonie S. Rowe, Judge; L.T. Case No. 502021CF010028A.

Matthew Rogoff and Jonathan Jordan of Rier Jordan Law, Miami, for petitioner.

James Uthmeier, Attorney General, Tallahassee, and Sorraya M. Solages-Jones, Assistant Attorney General, West Palm Beach, for respondent.

PER CURIAM.

In this prohibition petition, the defendant seeks review of an order denying his motion to dismiss, in which he claimed immunity from prosecution for second-degree murder because he acted in self-defense.[1] We agree with the defendant that the state failed to meet its burden of disproving his claim of immunity by clear and convincing evidence as statutorily required. We therefore grant the petition and direct the trial court to discharge the defendant from prosecution.

**Background**

---

[1] The order on review is the second order denying the defendant's motion to dismiss. In a prior case, we granted the defendant's certiorari petition and quashed the first order because the trial court applied the wrong burden of proof. *See Corbett v. State,* 348 So. 3d 645, 647-48 (Fla. 5th DCA 2022) (holding that certiorari is the appropriate remedy for a procedural error in denying a claim of self-defense immunity).

The defendant was charged with second-degree murder following the shooting death of the victim. The defendant does not dispute that he shot the victim. He claims he is immune from prosecution because he reasonably believed that his use of deadly force was necessary to prevent imminent death or great bodily harm or to prevent the imminent commission of a forcible felony. §§ 776.012(2), 776.032(1), Fla. Stat. (2021). The state concedes the defendant raised a prima facie case of self-defense immunity in his motion to dismiss, and therefore it had the burden of proving by clear and convincing evidence that his use of deadly force was not justified. § 776.032(4), Fla. Stat.

The relevant facts are generally undisputed. The shooting occurred at a gated parking lot where the defendant, the victim, and other men worked on cars. Prior to the shooting, the victim had threatened the defendant and had been antagonistic toward other men while at the lot. The incident was captured by a surveillance camera near the parking lot.

On the day of the shooting, the defendant arrived at the parking lot, parked outside, and walked in through the gate. The victim arrived shortly thereafter and demanded the defendant open the gate so he could pull his car into the lot. The defendant did not open the gate and continued to walk into the lot.

The victim began shouting at the defendant and continued to yell at him from his car, repeatedly threatening to "whoop his ass." When the defendant was about fifty feet into the parking lot, the victim got out of his car and started quickly walking toward the defendant in an aggressive manner. As he got closer to the defendant, the victim quickened his pace and placed his hands on his front pocket. The defendant saw the victim aggressively approaching him. When the victim was within about six feet of the defendant, the defendant drew his gun from behind his back and fired one shot at the victim.

The victim turned and ran back toward his car. The defendant followed the victim with his gun drawn. As soon as the victim fell to the ground, the defendant unloaded his gun and placed it on the hood of a nearby car. The defendant called 911 less than a minute after the shooting.

When the police arrived, they found the victim lying on the ground near his car. The defendant walked out through the gate with his hands up, appearing to be in shock. He said he shot the victim because the victim was threatening him.

2

In his police statements and hearing testimony, the defendant said the victim was often antagonistic toward the men who worked in the lot and had threatened to beat the defendant about two months before the shooting. The defendant knew the victim often carried a gun.

When the victim first started yelling at him on the day of the shooting, he continued walking through the gate because he thought the victim was just going to "talk trash like he always do." But when the victim got out of his car and began moving aggressively toward him, he realized the victim "meant what he said he was going to do." The defendant feared he could not defend himself against a physical attack from the victim because the victim was in "great shape," while the defendant had several medical conditions and physical limitations. The defendant also thought the victim might have been carrying his gun because of how he put his hand near his pocket as he approached the defendant.

Alternatively, the defendant feared the victim could have taken his gun and used it against him. The defendant said he followed the victim with his gun drawn after the shooting only to ensure the victim no longer posed a threat. He called 911 immediately after the victim fell to the ground because he hoped the victim's life could be saved.

The only fact the state disputed was the defendant's initial assertion at the scene of the shooting that he first turned around and saw the victim moving toward him when the victim was only a few feet behind him. The surveillance video showed the defendant actually turning around soon after the victim got out of his car. In later statements and in his hearing testimony, the defendant explained that he turned around when he first heard the victim moving toward him, but victim was "closing in pretty quickly" and "it happened fast."

The court found the defendant's testimony generally credible, and it specifically credited his testimony that the victim was "continually approaching [him] in an aggressive manner." But the surveillance video showed the defendant "facing [the victim] that entire time."[2] Based on that finding, the trial court ruled the state had proven by clear and convincing evidence that the defendant was not entitled to immunity because he did not have an objectively reasonable belief, specifically at the time of the

---

[2] Notably, the trial court did not find the contradiction between the surveillance video and the defendant's initial statement lessened his overall credibility.

shooting, that the use of deadly force was necessary to prevent imminent death or great bodily harm.[3]

This prohibition petition followed.

## Analysis

A prohibition petition is the proper vehicle to review the merits of an order denying a self-defense immunity claim. *Corbett*, 348 So. 3d at 647-48; *Jefferson v. State*, 264 So. 3d 1019, 1023 (Fla. 2d DCA 2018). In reviewing the trial court's order, we defer to its factual findings and credibility determinations as long as they are supported by competent substantial evidence. *Edwards v. State*, 351 So. 3d 1142, 1149-51 (Fla. 1st DCA 2022). We review de novo whether the evidence supports its ultimate legal conclusion that the defendant is not entitled to immunity. *Id.*

Our legislature created the Stand Your Ground law to immunize persons from criminal prosecution when they are justified in using deadly force. All that is required is that he or she reasonably believe that using such force is necessary to prevent "imminent death or great bodily harm" or to prevent "the imminent commission of a forcible felony." §§ 776.012(2), 776.032(1), Fla. Stat.

No longer does a person have a duty to retreat before using deadly force if he or she "is not engaged in a criminal activity and is in a place where he or she has a right to be." § 776.012(2), Fla. Stat. A defendant need only raise a prima facie self-defense claim. *Martin v. State*, No. 4D2025-0304, 2025 WL 1572584, at *2 (Fla. 4th DCA June 4, 2025). Once established, our legislature has declared that the state bears the **burden of overcoming a self-defense claim by clear and convincing evidence**. § 776.032(4), Fla. Stat. Evidence is clear and convincing when "the truth of the facts asserted is highly probable." *Edwards*, 351 So. 3d at 1151. The "sum total of the evidence" must be "of sufficient weight to convince the trier of fact without hesitancy." *Id.* (citation omitted).

The reasonableness of a person's belief that the use of deadly force was necessary is measured by an objective standard, but "whether the person's belief was objectively reasonable must be determined from the point of view of the person at the time the person used deadly force." *Smith v.*

---

[3] The court did not expressly address whether the defendant had an objectively reasonable belief that the use of deadly force was necessary to prevent the imminent commission of a forcible felony. *See* § 776.012(2), Fla. Stat.

4

*State*, No. 6D2023-2239, 50 Fla. L. Weekly D1403a (Fla. 6th DCA June 27, 2025).

The trial court must determine "whether, based on circumstances **as they appeared to the defendant** when he or she acted, a reasonable and prudent person situated in the same circumstances and knowing what the defendant knew would have used the same force as did the defendant." *Mobley v. State*, 132 So. 3d 1160, 1164-65 (Fla. 3d DCA 2014) (emphasis added). Relevant considerations include the victim's reputation of being a violent or dangerous person, any prior threats by the victim against the defendant, and the relative physical abilities of the victim and the defendant. Fla. Std. Jury Instr. (Crim.) 3.6(f).

Here, the evidence does not support the trial court's conclusion that the state met its burden of proof. The defendant's testimony was largely unrefuted, and the trial court found the defendant to be credible. The trial court specifically credited the defendant's testimony that the victim got out of his car and aggressively approached the defendant after repeatedly threatening to "whoop his ass."

Rather than simply open the gate and drive into the lot, the victim got out of his car and aggressively approached the defendant, yelling at him. The victim had threatened the defendant before and was known to carry a gun. As the victim approached, he moved his hand near his front pocket. Fearing for his life, the defendant drew his gun and shot the victim.

These circumstances support the defendant's position that a reasonable person would have believed that the use of deadly force was necessary to prevent imminent death or great bodily harm or the imminent commission of a forcible felony. *See* § 776.012(2), Fla. Stat.; *Edwards*, 351 So. 3d at 1151; *Smith*, 50 Fla. L. Weekly D1403a. The state failed to the meet its statutorily imposed higher burden to establish by clear and convincing evidence that the defendant's use of deadly force was not justified.

The trial court reached the opposite conclusion solely because the defendant turned around soon after the victim got out of his car.

We are mandated to follow the law as dictated by our legislature. Under existing law, the defendant did not have a duty to retreat, warn the victim that he had a gun, or otherwise try to avoid or defuse the threat posed. § 776.012(2), Fla. Stat.; *Mobley*, 132 So. 3d at 1165; *see also Navarro v. State*, 190 So. 3d 212, 215 (Fla. 4th DCA 2016) (holding that instructing the jury that the defendant's use of force was justified only if he had no

5

other means to avoid the danger effectively imposed a duty to retreat that the defendant did not have).

In sum, we reach the only legally imposed conclusion that the state failed to meet its burden of proving by clear and convincing evidence that the defendant's use of deadly force was not justified under section 776.012(2). We therefore grant the petition and direct the trial court to discharge the defendant from prosecution.

*Petition granted.*

MAY and LEVINE, JJ., concur.
FORST, J., specially concurs with opinion.

FORST, J., specially concurring.

Brandon Bell was shot and killed by defendant Ivin Spencer. Bell was unarmed at the time. Spencer has asserted a stand your ground ("SYG") defense to the State's murder charges. An "objective standard" is to be applied in "determin[ing] whether, based on *circumstances* as they appeared to the defendant when he or she acted, a reasonable and prudent person situated in the same *circumstances* and knowing what the defendant knew would have used the same force as did the defendant[.]" *State v. Quevedo*, 357 So. 3d 1249, 1253 (Fla. 3d DCA 2023) (emphases added) (quoting *Viera v. State*, 163 So. 3d 602, 604 (Fla. 3d DCA 2015)).

Per our opinion, Spencer will not be tried for first-degree murder, second-degree murder, manslaughter, or any other count stemming from his shooting Bell. Nonetheless, I concur in the majority opinion as I am compelled to conclude that our current applicable SYG "deadly force" statutes (§§ 776.012(2), 776.032(1), Fla. Stat. (2021)) dictate this result. I write specially to detail the "circumstances" that contributed to this holding and to highlight some (perhaps) unintended consequences.

Here, Spencer's motion "to dismiss the existing information pending against him on the grounds that he is immune from prosecution for the justified use of force in this case" relies upon the following "circumstances" in asserting his SYG immunity plea:

- Bell was nicknamed "Boss" or "Boss Hog," and "frequently bullied and confronted" Spencer and others who worked in the shared storage lot that served as both parties' workspace.
- Bell had told Spencer's friend and co-tenant three months before the shooting that he (Bell) was going to "beat [Spencer's] ass."

6

The friend had conveyed this threat to Spencer.

- Spencer had seen Bell carry a gun on his person numerous times.
- Bell was younger and more fit than Spencer—the latter was "technically obese," was taking medication for pre-diabetes and hypertension, and was receiving physical therapy for back, shoulder, hip, and ankle pain.
- After Spencer had rejected Bell's demand to move his vehicle from blocking the gate, Bell threatened and cursed Spencer, first making a conditional threat ("if you don't move your car I'll whoop your ass"), and then, as Bell fast-walked toward Spencer, Bell stated he was going to "whoop [Spencer's] ass."
- Bell's "gait, demeanor, movement, and body language all demonstrated he was going to physically assault" Spencer.
- Spencer had nowhere to run, nowhere to hide, as Bell stood between Spencer and the fenced property's gate.
- When Bell was about ten feet from Spencer, Bell declared, as he continued his approach, "I'm going to slap your bitch ass right now."
- Spencer told the police that, after Spencer had pointed his gun at Bell when they were only feet apart, Spencer's fears were accentuated because "it appeared Mr. Bell had a black object in his hand, thought to be the firearm he had seen on prior occasions."

*Noteworthy*: The defense provided statements from Spencer and two others who had heard Bell threaten to harm Spencer, but no evidence shows that Bell had ever physically assaulted Spencer or anyone else. Nonetheless, this is a case where the victim's physical stature (particularly when juxtaposed with the defendant's physical stature) and *reputation* (as a "bully" and gun-carrier) preceded him, to his detriment. A reputation as a gun carrier might provide the carrier with a deterrent against an assault, but it is also a circumstance to consider when weighing the reasonableness of the SYG defendant's fear of great bodily harm and the defendant's responsive use or threatened use of deadly force. Here, the "victim is known to carry a gun" argument contributed to Spencer's SYG defense, notwithstanding the fact that no gun was actually seen before the SYG shooting or recovered after the shooting.

In this case, however, the victim's reputation as a gun carrier was not determinative, as the unarmed, but physically intimidating Bell was a threat to cause great bodily harm to the "technically obese" Spencer. If the roles were reversed and it was Spencer that had been fast-walking belligerently toward Bell and making verbal threats, the aggressor's

reputation as a gun carrier would factor more heavily in determining whether the non-aggressor reasonably believed great bodily harm (or death) was imminent.

*Also noteworthy*: Bell didn't declare that he was going to kill or seriously hurt Spencer. Instead, Bell threatened harm—by beating, "whooping," and kicking—Spencer's "ass." On the one hand, it is quite possible that Bell was desensitized with respect to the "kick your ass" threat due to its overuse in today's culture. In fact, Spencer told an investigating officer that when Bell made his "whoop [Spencer's] ass" statement while still outside the gate, Spencer continued walking away because he thought Bell was just going to "talk trash like he always do." On the other hand, **context matters**. If Spencer had shot Bell after the first "kick your ass" threat *when Bell was still in his car*, SYG immunity would seemingly be unlikely (unless Bell was pointing a gun at Spencer at that point). Here, the fatal shot was fired after Bell had aggressively pursued Spencer and was nearly upon him. This is why an examination of all the circumstances is so important.

In *Sigismondi v. State*, 380 So. 3d 1208 (Fla. 2d DCA 2024), the appellate court found the trial court did not abuse its discretion in assigning little credibility to testimony that the SYG victim had threatened, "when I see [the SYG defendant], I'm going to kick his ass." *Id.* at 1216, 1218-19. The appellate court relied on the trial court's finding "that the context of the statement was not trustworthy considering [the victim] made the statement to someone he only met once [and] it was unclear whether he was joking or serious, given that he did not leave to go find [the defendant]." *Id.* at 1219. On the other hand, a threat to "bust [the defendant's] mouth and bust out his teeth," made when the victim was walking toward the defendant, was relevant in assessing the defendant's state of mind with respect to the "circumstances" leading to the SYG use of deadly force. *Quevedo*, 357 So. 3d at 1253.

*Lastly noteworthy*: In this case, the only victim of a SYG shooting was the perceived assailant. However, it takes little imagination to think of situations in which a SYG shooter goes from potential victim to perceived aggressor or a SYG gunshot injures or kills an innocent bystander. Imagination isn't necessary to comprehend the latter situation. Last year, an individual in Michigan was not charged with any crime after shooting and killing an individual who had threatened the shooter and others with imminent death or great bodily harm; unfortunately, the bullet that was shot in self-defense also struck and killed a completely innocent bystander. *Shooter Acted in Lawful Self-Defense in Eastern Market Fatal Shootings*, Charter Cnty. Wayne Mich. (Sep. 18, 2024),

8

https://www.waynecountymi.gov/Prosecutor-Press-Releases/2024/Shooter-Acted-in-Lawful-Self-Defense-in-Eastern-Market-Fatal-Shootings.  An innocent bystander is more likely to be fatally struck by a stray bullet fired in self-defense than by a stray uppercut or pepper spray or karate kick.

Bell overreacted to Spencer not opening the gate as Bell's vehicle approached.  Bell's past threats, his reputation, his size/fitness relative to Spencer, and his new threats as he purposefully walked toward Spencer combined to create a reasonable belief on Spencer's part that deadly force was necessary to prevent the objectively real possibility of great bodily harm, death, or a forcible felony.  Whether one can argue, putting aside the SYG statutes and caselaw, that firing a lethal shot at an unarmed individual with no warning is itself an overreaction, is of no consequence in a court of law.  "Judges are required to follow the law and apply it fairly and objectively to all who appear before them.  No judge is permitted to substitute his concept of what the law ought to be for what the law actually is." *In re Inquiry Concerning a Judge, J. Q. C. No. 77-16*, 357 So. 2d 172, 179 (Fla. 1978).

*     *     *

**_Not final until disposition of timely filed motion for rehearing._**