298 So.2d 461 (1974)
Roy R. PRICE, Appellant,
v.
GRAY'S GUARD SERVICE, INC., a Corporation and the Fidelity and Casualty Company of New York, a Corporation, Appellees.
No. T-67.
District Court of Appeal of Florida, First District.
July 16, 1974.
Rehearing Denied August 28, 1974.
*462 S. Thompson Tygart, Jr., Jacksonville, for appellant.
Claude K. Slater of Slater & Randle, and Barry L. Zisser of Zisser & Zisser, Jacksonville, for appellees.
BOYER, Judge.
Plaintiff in the trial court has appealed a summary final judgment in favor of the defendants.
The facts are not in substantial dispute but must, of course, be construed most favorably to the plaintiff in our review of a summary judgment in favor of the defendants.
Gray's Guard Service was in charge of security at the Greater Jacksonville Fair held in 1969 at the Gator Bowl. The guards employed by Gray's Guard Service were authorized by the sheriff of Duval County to carry a gun but they enjoyed no arrest powers. On October 20, 1969 one Petty, a guard employed by Gray's Guard Service, was stationed at Gate No. 5, which gate was not open to the general public but was reserved for exhibitors and other persons connected with the fair. There was no facility at that gate for the sale or collection of tickets.
Petty was a career navy man having there received training in firearms and having experienced guard duty, shore patrol duty and sentry duty. He had been *463 employed by Gray's Guard Service for a little over a year.
On the night of October 20, 1969 one James R. Price accompanied by Billy Frank Motes arrived at the Greater Jacksonville Fair at some time between 10:00 and 11:00 p.m. Both Price and Motes were big, strong young men, each approximately five feet eleven inches tall and weighed approximately 170 pounds. Price had been a high school football player.
Price and Motes attempted to enter the fair at Gate No. 5 but were informed by Petty that that gate was not open to the general public and that they could not there enter. A rather brisk conversation ensued, culminating in an exchange of curse words but no altercation. Price and Motes finally entered the fair through an appropriate gate where there was a booth for the sale and collection of tickets. They remained at the fair where they met and chatted with various acquaintances until the fair closed, which was approximately one hour after their arrival. While there they took in the rides, sideshows and other attractions, walking the entire midway while stopping occasionally to talk with friends. They did not, during that period, discuss with any of their friends the prior incident with Petty.
When the fair closed Price and Motes left through the gate by which they had entered and proceeded to walk toward their car. Price then began to talk about the earlier incident with Petty, telling Motes that he was going "to whip his ass." Motes admonished Price that "you ought to leave him alone." They then discussed the fact that Petty was armed with a pistol but Price insisted that he "wanted to jump on the guy" and to "knock him down", saying "to hell with him." As they approached Gate No. 5 Price said to Motes "let's get him." Thereupon Price grabbed Petty from the blind side and Motes immediately grabbed him from the other side, both hitting him, one getting a slug into Petty's jaw. Motes managed to wrench Petty's billyclub away from him and commenced hitting him with it. Petty's glasses and his uniform cap were knocked off. Petty did not know who his assailants were, but although both arms were pinned to his body by Price and Motes as they attempted to wrestle him to the ground Petty managed to draw his pistol and fire. The first shot found its mark in Price, and Motes discontinued his attack and fled.
Motes testified that his best approximation of the time that the assault and beating of Petty had been in progress before Petty drew his pistol was approximately 30 seconds. Price was pronounced dead upon arrival at the hospital.
Price's administrator filed suit against Gray's Guard Service, Inc. and its bonding company. After permitting several amended complaints the trial judge granted a motion for summary judgment in favor of both defendants.
The briefs of the parties filed here address themselves primarily to the doctrine of respondeat superior. We do not find it necessary to reach that point since our examination of the record simply reveals that plaintiff has no cause of action. Indeed, under the facts of the case, we are amazed that suit was ever filed. The record does not reveal one iota of evidence of negligence on the part of Petty. This is not a case of "hot blood". Price had ample opportunity to "cool down" assuming, arguendo, that the initial encounter with Petty was sufficient to raise his ire. Price and Motes deliberately attacked Petty while he was in uniform, knowing him to be armed. Petty did not even know who his assailants were or that he was about to be attacked until he was grabbed from "the blind side". What, we ask rhetorically, was Petty supposed to do upon being suddenly attacked from behind by two young men who gave every indication that they intended "to do him in." Petty acted as would have any reasonable prudent person under the circumstances. He was legally on duty as a guard. He was *464 legally authorized to carry a gun. For all practical purposes he was a police officer. Guns are not worn by officers of the law merely as decorations. Petty's arms were pinned beside him and he was being beaten with his own club. He had no opportunity to retreat initially and no opportunity, after being attacked, to cogitate as to his next move. Price and Motes neglected to inform Petty in advance that they really intended to do him no harm but simply wanted to afford themselves an opportunity to vent their anger. Petty's action under such assault was that of an individual who was fighting to protect his own life and body from what he reasonably believed to be imminent peril and, indeed, death. The attack upon Petty was sudden, unprovoked and without warning. A person unlawfully assaulted may repel force by force to the extent which to him seems reasonably necessary under the circumstances to protect himself from injury. (3 Fla.Jur. Assault and Battery, Section 20) A person who has no reason to believe that he can with safety avoid the necessity of defending himself is privileged to defend himself against another by force intended or likely to cause death or serious bodily harm, when he himself reasonably believes that the other is about to inflict upon him an intentional bodily harm or death. (See Restatement of Torts, 2d, Section 65) The conduct of a person acting in self defense is measured by an objective standard, but the standard must be applied to the facts and circumstances as they appeared at the time of the altercation to the one acting in self defense. A person acting in self defense is not held to the same course of conduct which might have been expected had he been afforded an opportunity of cool thought as to possibilities, probabilities and alternatives. (See Prosser on Torts, 3rd Ed., page 110)
Petty, under the circumstances, could most certainly not retreat because he was being held and wrestled to the ground by two overpowering young men. Once upon the ground, with Motes swinging the billyclub and Price intent upon "whipping his ass" the superior force of his attackers may well have resulted in Petty's demise. A person simply is not required to docilely acquiesce while under such vicious and sudden attack. The 30 seconds which elapsed between the commencement of the attack and the time that Petty fired afforded no opportunity for meditation nor deliberation. A quick decision had to be made and we are not prepared to say that, under the circumstances, Petty acted rashly. Certainly he did not act negligently.
Neither the parties' briefs nor our independent research have revealed any cases involving such bizarre circumstances. The reason is obvious: Never before has anyone had the intestinal fortitude to bring suit under such circumstances. If they did, they did not take an appeal when they lost.
According to the philosopher Jean-Jacques Rousseau (French, 1712-1778) men were originally wild and free, accountable to no one. A man's possessions, including freedom and indeed his very life, depended entirely upon his mental and physical prowess. Every man was the law unto himself, responsible to no one. (See also Holy Bible, Judges 21:25)
The English philosophers, Thomas Hobbs (1588-1679) and John Locke (1632-1704) philosophized that men, in order to protect themselves from aggression, greed, violence, disorder and strife, consciously banded together, sacrificing some of their unfettered rights and freedom in order to secure unto themselves the exercise of their remaining rights within a legally defined social system. (See also Holy Bible, 1 Samuel 8:19-20)
The responsibility for maintaining order in civilized societies originally rested in the military, which exercised the absolute authority of the crown. The word "police" comes from the Latin word politia which means "the state". In ancient times a trespass against a soldier, or the police, while discharging his duties was an affront to the crown, usually punishable by death. Modern civil police, as distinguished from *465 the military, had their genesis in Great Britain by the establishment in 1829 of the metropolitan police in the sprawling urban and suburban areas surrounding the City of London by the home secretary, Sir Robert Peel. (Thus the popular term "bobby" to denote a policeman in England.) (Encyclopedia Brittanica, Police)
We are living in an era in which it is popular to challenge established authority. Numerous institutions and firms are finding it necessary to retain the services of guard companies, there simply being insufficient police protection. There are those, we are informed, who consider it a mark of distinction to physically attack, without provocation, uniformed guards and policemen. We hope that Petty's action, the trial judge's summary judgment, and our affirmance, might serve as some deterrence to such a dangerous (both to society and to the attacker) practice.
Affirmed.
McCORD, J., and DREW, E. HARRIS, (Ret.), Associate Judge, concur.