SHEPHERD, J.
This is an appeal from a trial court order granting, in part and denying, in part, a defendant’s motion to dismiss a four-count information for aggravated assault with a firearm (Counts I & II), unlawful discharge of a firearm in public (Count III), and improper exhibition of a firearm (Count IV) on the ground he was immune from suit under Florida’s Stand Your Ground Law, sections 776.013-.082, Fla. Stat. (2007). We affirm the decision of the trial court.
Under Florida’s Stand Your Ground Law,
A person who is not engaged in an unlawful activity and who is attacked in any other place where he or she has a right to be has no duty to retreat and has the right to stand his or her ground and meet force with force, including deadly force if he or she reasonably believes it is necessary to do so to prevent death or great bodily harm to himself or herself or another or to prevent the commission of a forcible felony.
§ 776.013(3), Fla. Stat. (2007). Such a person is immune from criminal prosecution under these circumstances. § 776.032(1), Fla. Stat. (2007); Dennis v. State, 51 So.3d 456, 462 (Fla.2010).
When a defendant invokes the statutory immunity, the trial court must hold a pre-trial evidentiary hearing to determine if the preponderance of the evidence warrants immunity. State v. Yaqubie, 51 So.3d 474, 476 (Fla. 3d DCA 2010). The defendant bears the burden of proof on the issue of whether immunity attaches to his actions. Peterson v. State, 983 So.2d 27, 29 (Fla. 1st DCA 2008). The evidence received at the pre-trial hearing in this case is sharply conflicting.
The case arises out of an incident which occurred on March 9, 2009, on residential mobile-home property occupied by Ernesto C. Vino and his family. At about 10:00 a.m. on that date, two Florida Power & Light Company (FPL) collection department employees sought to enter the premises by using a ladder to climb over Vino’s locked fence. Their purpose was to disconnect the electricity at meters on the property serving both Vino and a next door neighbor.[1]
The FPL employees testified that they approached the property, honked their truck horn, and yelled “FPL” over the fence to try to get the attention of anyone inside the mobile home before they traversed the locked fence. They further testified that upon entering the property, one of them knocked on the front door of the mobile home as the other started toward the back of the house. According to them, Vino angrily charged out of his house, bearing a rifle and, despite immediately recognizing the men as FPL employees, screamed at them, assaulted them with his weapon, hit one of the men in the head, knocking off his FPL pith hat, and ordered them to leave the property. It is their testimony that as the last of the two men climbed back over the fence, Vino fired one shot from his rifle into the air, yelling “If you ever [expletive] come back here, I will blow your [expletive] head off.”
Vino’s testimony, supported by that of his neighbors, was to the contrary. Vino testified he was asleep in his living room when his dogs began barking. He looked *718 out and saw the ladder. Because the mobile-home park is in a high crime area and he had been the victim of crimes against his person and property on prior occasions, he selected one of his weapons and opened the door. If the FPL employees tried to alert him of their entry to the property, he professed not to know it. Seeing an unidentified male on his property, he took cover behind his truck and yelled at him, discharging his weapon into the ground one time to let him know he was serious. He then learned the individuals were FPL employees. Angry because they did not call ahead of time, or otherwise identify themselves, Vino ordered them off the property. He eschewed any criminal behavior toward the FPL employees as they exited.
Weighing the conflicting evidence as it was required to do, Peterson, 983 So.2d at 29, the trial court largely credited the testimony of Vino and his neighbors. The court made the following factual findings:
1. On or about March 9, 2009, two Florida Power and Light Company employees, Timothy Pyke and Bruno Ber-rio, arrived at the Defendant’s trailer park, located at 14601 N.W. 185th Street, Miami, Florida in an unmarked vehicle that was personally owned by Mr. Pyke.
2. The purpose of the F.P.L. employees visit was to either collect money for outstanding balances on F.P.L. accounts or disconnect service on several homes located within the confines of the trailer park area.
3. Mr. Pyke and Mr. Berrio first made contact with Patricia Contreras, a resident of the trailer park and neighbor of Ernesto C. Vino.
4. Mr. Pyke and Mr. Berrio attempted to collect monies for her past due F.P.L. account. Ms. Contreras was unable to pay the outstanding balance and Mr. Pyke and Mr. Berrio were going to disconnect her power.
5. Ms. Contreras’ electrical box was physically located within the confines of Mr. Vino’s completely gated property.
6. Mr. Pyke and Mr. Berrio also had instructions to collect an outstanding balance for Mr. Vino’s account.
7. While attempting to enter Mr. Vino’s property, Mr. Pyke and Mr. Ber-rio saw that Mr. Vino’s gate was locked and there was no other entry point into Mr. Vino’s property. Therefore, Mr. Pyke and Mr. Berrio took their ladder and placed it over Mr. Vino’s gate.
8. Both Mr. Pyke and Mr. Berrio used the ladder to climb over Mr. Pyke’s fence and gain entry in Mr. Vino’s property.
9. Upon doing so, both Mr. Pyke and Mr. Berrio proceeded to the rear of Mr. Vino’s trailer in order to gain access to the electrical boxes located on Mr. Vino’s property.
10. While doing so, Mr. Vino’s dogs began to bark. Mr. Vino, who was sleeping at the time, was awoken from his sleep and immediately looked outside his front window.
11. While looking out his window, Mr. Vino noticed a ladder that was placed over his fence.
12. Mr. Vino immediately looked out from his side window and noticed an unknown male walking away from him toward the rear of his trailer. Neither Mr. Pyke nor Mr. Berrio, from behind, were identifiable as FPL workers.
18. Mr. Vino resides with his wife and two (2) minor daughters in his home. Mr. Vino has also been a victim of several crimes in his home — an aggravated burglary, an aggravated assault with a deadly weapon and an aggravated battery, which resulted in his hospitalization.
*719 14. Upon noticing this unknown individual, Mr. Vino secured a rifle and immediately exited his front door.
15. Mr. Vino hid behind his vehicle and yelled out to Mr. Berrio that he had a firearm, which Mr. Vino was pointing at Mr. Berrio’s back. Mr. Vino asked Mr. Berrio to identify himself.
16. Mr. Berrio turned around and began to walk towards Mr. Vino. Immediately, Mr. Pyke also turned around and began to walk towards Mr. Vino.
17. Mr. Vino, upon recognizing that Mr. Pyke and Mr. Berrio were F.P.L. employees, lowered his weapon and asked Mr. Pyke and Mr. Berrio why didn’t they call him before entering his property.
18. Mr. Pyke and Mr. Berrio were escorted to the ladder and fence. Both Mr. Pyke and Mr. Berrio climbed the ladder and exited Mr. Vino’s property. As they were exiting, Mr. Vino fired one shot, not at Mr. Pyke or Mr. Berrio, but up in the air.
19. Upon exiting Mr. Vino’s property, Mr. Pyke and Mr. Berrio entered Mr. Pyke’s personal and unmarked white pick-up truck and drove out of the trailer park.
The court then concluded:
This Court, following the dictates of the Stand Your Ground legislation, and consistent with the State’s Statement of Particulars as orally given to the Court during the hearing, therefore hereby dismisses Counts I, II and IV of the Information without prejudice to the State to refile any counts they in good faith believe they could proceed on after the point that the defendant realized the two men were FPL employees and therefore no burglars who posed a forcible felony threat to the defendant or his family.[2] Count III, unlawful discharge of a firearm, is not dismissed as it clearly occurred after the defendant realized the two men were FPL employees and no longer a forcible felony threat.
On appeal, the trial court’s legal conclusion is reviewed de novo, but its findings of fact are presumed correct and can be reversed only if they are not supported by competent substantial evidence. See Mederos v. State, 102 So.3d 7 (Fla. 1st DCA 2012); Loredo v. State, 836 So.2d 1103, 1104 (Fla. 2d DCA 2003). In conducting its review, an appellate court must restrain itself from the natural human impulse to consider that its own view of the facts is superior to that of a trial judge. See Herzog v. Herzog, 346 So.2d 56 (Fla.1977). So long as there is competent substantial evidence to support the findings made by the judge who was on the scene, the reviewing court must yield. Id. at 57. After a careful review of all of the testimony taken in this case, we conclude the findings of the trial court are supported by competent substantial evidence.
We also approve the trial court’s legal conclusion in this case, holding that Vino *720 may claim the stand your ground defense only up to the point he learned the individuals on his property were FPL employees.[3] Accordingly, the State is free to either amend or refile its information to include only the events after Vino’s immunity ended. See Fla. R.Crim. P. 3.140 (authorizing amendment to an information on the motion of the prosecuting attorney or defendant at any time prior to trial); State v. Anderson, 537 So.2d 1373, 1375 (Fla.1989) (“[T]he state may substantively amend an information during trial, even over objection of the defendant, unless there is a showing of prejudice to the substantial rights of the defendant. This proposition is even more relevant when, as here, the amendment occurs prior to trial.”).
For all of these reasons, we affirm the well-reasoned decision of the trial court.

. FPL has a statutory right to enter the property of its customers for this and other related service purposes. See § 361.01, Fla. Stat. (2010); see also FPL Tariff Rules 2.8, 5.6, http://www.fpl.com/customer/rates_and_bill/ rules_tariffs.shtml.

. The State concedes the actions of the FPL workers satisfied the ''entry” requirement of the burglary statute. As the State points out, the definition of dwelling for purposes of the burglary statute is as follows: "a building or conveyance of any kind, including any attached porch, whether such building or conveyance is temporary or permanent, mobile or immobile, which has a roof over it and is designed to be occupied by people lodging therein at night, together with the cartilage thereof." § 810.011(s), Fla. Stat. (2007). In State v. Hamilton, 660 So.2d 1038 (Fla.1995), the Florida Supreme Court found that in order for property around a dwelling to constitute curtilage there must be "some form of an enclosure in order for the area surrounding a residence to be considered part of the 'curti-lage' as referred to in the burglary statute.” Id. at 1044. The testimony at the hearing was that Appellee's property was surrounded by a fence, thus, as the State points out, it would fall under the definition of curtilage for purposes of the burglaiy statute.

. FPL in its amicus brief expresses concern over the special burden this law places on its more than 3,000 field employees in the state for whom unlawful customer resistance in the field is a constant hazard. FPL has strict protocols concerning when and how it exercises its statutory privilege to enter onto customer property. However, unlike law enforcement officers, see § 776.013(2)(d), Fla. Stat. (2007), the Stand Your Ground Law makes no exception for public utility workers. Rectifying the Legislature’s omission is not within the purview of this court. Jackson Cnty. Hosp. Corp. v. Aldrich, 835 So.2d 318, 330 (Fla. 1st DCA 2002).