WELLS, Judge.
We have jurisdiction to review the instant petition for writ of prohibition seeking to preclude the court below from proceeding further in adjudicating criminal charges against petitioner, Gabriel Mobley, on the grounds that Mobley is immune from prosecution under the provisions of Chapter 776 of the Florida Statutes (Florida’s Stand Your Ground Law). See Mederos v. State, 102 So.3d 7, 11 (Fla. 1st DCA 2012) (“A writ of prohibition is the proper vehicle for challenging a trial court’s denial of a motion to dismiss a charge on the ground of immunity from prosecution pursuant to the Stand Your Ground Law.”); see also Little v. State, 111 So.3d 214, 216 n. 1 (Fla. 2d DCA 2013) (“We believe that the better avenue for review [of orders denying motions to dismiss asserting immunity under the Stand Your Ground Law] is a petition for writ of prohibition, which the supreme court has consistently held is an appropriate vehicle to review orders denying motions to dismiss in criminal prosecutions based on immunity.”).
The standard of review applicable to this case is the same as that which is applied to the denial of a motion to suppress. See Mederos, 102 So.3d at 11 (stating that “a review of a trial court’s order on a motion claiming immunity under the [Stand Your Ground] statute is governed by the same standard which applies in an appeal from an order denying a motion to suppress”); State v. Vino, 100 So.3d 716 (Fla. 3d DCA 2012) (citing Mederos for the *1162 applicable standard of review). Under this standard, the trial court’s findings of fact are “presumed correct and can be reversed only if they are not supported by competent substantial evidence,” while the trial court’s legal conclusions are reviewed de novo. Vino, 100 So.3d at 719. For the reasons that follow, we grant the petition but withhold issuance of our writ confident that the court below will comply with this court’s order.

Facts

Gabriel Mobley, the petitioner here, was charged with two counts of second degree murder following a shooting which took place outside a local Chili’s restaurant on February 27, 2008. The day of the fatal shooting, Mobley finished work around 3:00 pm at his pressure cleaning business, and after going home to shower and change, went to work at the tax preparation office of high school friend, Jose (Chi-co) Correa.[1] After working several hours at Chico’s business, Mobley was invited by Chico to join him and his staff at a local Chili’s to unwind. Mobley agreed to join them but drove his own car intending to go home from the restaurant. When Mobley arrived at the restaurant, he removed the handgun that he was carrying and stowed the gun in the glove compartment of his car.[2] He did so because he believed from the training that he had received to secure a concealed carry license that firearms could not be brought into any establishment where food and alcohol are served.[3] By the time Mobley got to the restaurant, a number of Chico’s female employees had arrived and were sitting at a booth located near one end of the restaurant’s bar. Because the booth was crowded, Mobley, Chi-co, and another of Chico’s employees (another man) sat at the bar nearest the booth.
Sometime after food and drinks were ordered, Mobley and Chico went outside to smoke. They returned to the bar where they ate, drank and conversed without incident. However, things changed after Mobley and Chico went outside a second time for a smoke. This time when they reentered the restaurant, they found two men, later identified as Jason Gonzalez and Rolando (Roly) Carrazana, talking to Chico’s female employees. According to Chico, the women seemed to be uncomfortable so he told the men to leave. This sparked a verbal altercation between Chico and the two men which continued until the two men returned to their table at the other end of the bar. The altercation, which lasted only a few minutes, was loud enough to attract the attention of the restaurant’s security guard and its manager, who asked the guard to keep an eye on Jason and Roly.
Mobley was not involved in the argument but acted as peacemaker instead, going to Jason’s and Roly’s table to ask them to forget what he described as a petty misunderstanding. He even shook Jason’s hand and gave him a friendly pat on the back. Mobley also spoke to a third person seated at the bar who appeared to be with Jason and Roly about forgetting *1163 this petty disagreement.[4]
Although the altercation appeared to have ended, Mobley testified that he began to feel uncomfortable after he noticed Roly staring in the direction of Chico’s party with a “mean, cold [look] on his face.”[5] He decided it was time to leave. But before he left, he and Chico went to the restroom where he expressed his concerns to his friend. As Mobley and Chico were returning from the bathroom, they passed the front of the restaurant where Mobley saw Jason, with Roly nearby, banging aggressively on the restaurant’s window and pointing toward them.[6] When Mobley and Chico reached their seats, Mobley suggested that after Jason and Roly left, they should all go home. Approximately ten to fifteen minutes later, after Jason and Roly appeared to have left, Mobley left the restaurant alone while Chico settled the check.
The events that transpired next were captured on a security camera recording made outside the restaurant, and, for the most part, are beyond dispute. The recording shows that at 23:52:15, Mobley, wearing only a sleeveless tee shirt, exited the Chili’s front door and went to his vehicle parked only feet away, but mostly outside the security camera’s viewing range. There, Mobley, as subsequent footage confirms, donned a sweat shirt, because, according to Mobley, it was chilly that night.[7] He also retrieved his gun and put it in a holster that he wore around his waist. Less than a minute after Mobley left the restaurant, Chico and the third man in their party exited the front door. Chico was joined by Mobley who walked with Chico to his nearby car.[8] There the two remained for approximately thirty seconds until, at 23:53:38, Mobley stepped onto the sidewalk near the front fender of Chico’s car. Approximately twenty seconds later, Chico joined him on the sidewalk where the two smoked a cigarette.
Four seconds after Chico joined Mobley on the sidewalk, Jason Gonzalez can be seen rapidly approaching from Mobley’s and Chico’s right. Four seconds after that, Jason delivered a vicious punch to Chico’s face which fractured Chico’s eye socket. Jason then can be seen to dance backward, hands raised in a fighter’s pose, and within four seconds of landing the punch on Chico advance forward toward Mobley. Mobley reacted by raising his arm and hand to ward Jason off. Two seconds later, as Jason steps back from Mobley, Roly can be seen rushing up from the rear of the restaurant to join Jason in what Mobley testified he believed to be a renewed attack on both himself and Chico. At this juncture, as Roly neared Jason, who was only feet from both Mobley and Chico, Mobley testified that he saw Roly reach under his long, baggy shirt. Believing that Roly was reaching for a weapon to *1164 use in an attack, Mobley drew his gun and shot at Roly hitting both Roly and Jason.
This entire series of events, from the time Jason first comes into view on the sidewalk until the first shot was fired, took only twelve seconds. After being shot, Jason turned and fled toward his (or Roly’s) car to collapse with a gunshot wound to the chest and die. Roly, hit four times, fell to the ground near the restaurant’s door where he was assisted by the third man in their party who had been sitting at the bar. Roly later died at a local hospital. Although no weapons were found on Roly’s body, two knives were found on the ground near where he fell.[9]
Following the shooting, Mobley remained at the scene and had the other members of his party, who by then were leaving in their cars, return to wait for the authorities. When police officers arrived only minutes later, Mobley told them that he was armed and otherwise fully cooperated with them. After being held in a police car for a number of hours, he was transported to the police station where he was read and waived his Miranda[10] rights. While there, he gave both an un-sworn and a sworn statement. He was then released but not charged.
Several weeks later, after a new lead investigator had been assigned to the case, Mobley agreed to be and was re-interviewed. While there is no indication that his version of the events changed in any manner during this interview, he subsequently was arrested and charged with two counts of second degree murder. Mobley claimed below and now claims here that these facts are undisputed and demonstrate that he is immune from prosecution as provided by sections 776.012 and 776.032 of the Florida Statutes. We agree in part that the pertinent facts are not in dispute and that Mobley is entitled to immunity from prosecution.

Analysis

Florida law confers immunity from criminal prosecution and civil liability, without the obligation to retreat, on those who use deadly force reasonably believing that the use of such force is necessary to either prevent imminent death or great bodily harm to self or others or to prevent the imminent commission of a forcible felony. See § 776.032, Fla. Stat. (2013) (providing that a “person who uses force as permitted in s. 776.012, s. 776.013, or s. 776.031 is justified in using such force and is immune from criminal prosecution and civil action for the use of such force”); see also § 776.012(1), (2), Fla. Stat. (2013) (providing that a “person is justified in the use of deadly force ... and does not have a duty to retreat if: (1) [h]e or she reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or herself or another or to prevent the imminent commission of a forcible felony; or (2) [ujnder those circumstances permitted pursuant to s. 776.013”).
An objective standard is applied to determine whether the immunity provided by these provisions attaches. See Montanez v. State, 24 So.3d 799, 803 (Fla. 2d DCA 2010) (confirming that in determining whether the immunity accorded by section 776.032 attaches, “the objective, reasonable person standard by which claims of justifiable use of deadly force are measured” should be applied). That standard requires the court to determine whether, based on circumstances as they appeared to the defendant when he or she acted, a *1165 reasonable and prudent person situated in the same circumstances and knowing what the defendant knew would have used the same force as did the defendant. See Toledo v. State, 452 So.2d 661, 663 (Fla. 3d DCA 1984) (“[A] person in the exercise of his right of self-defense may use ‘only such force as a reasonable person, situated as he was and knowing what he knew, would have used under like circumstances.’ ” (quoting People v. Moody, 62 Cal.App.2d 18, 143 P.2d 978, 980 (1943))); see also Chaffin v. State, 121 So.3d 608 (Fla. 4th DCA 2013) (confirming that the standard to be applied for determining whether a person is justified in using deadly force in self-defense is not a subjective standard as to the defendant’s state of mind, but an objective standard as to a reasonably prudent person’s state of mind); Price v. Gray’s Guard Service, Inc., 298 So.2d 461, 464 (Fla. 1st DCA 1974) (“The conduct of a person acting in self defense is measured by an objective standard, but the standard must be applied to the facts and circumstances as they appeared at the time of the altercation to the one acting in self defense.”).
Here, the court below determined that Mobley did not “reasonably” believe that deadly force was “necessary” to prevent “imminent” death, great bodily harm, or commission of a forcible felony. In doing so, the court discounted the totality of the circumstances facing Mobley and concluded that the use of deadly force was not reasonable, first, because Mobley “never saw a weapon and did not know anything about the possibility of a weapon,” with him only seeing “the second attacker appear to be reaching for something under his shirt,” and second, because Mobley should have brandished his gun, fired a warning shot or told the attackers to stop because he had a gun. We disagree for the following reasons.
As a preliminary matter, Mobley was not required to warn that he had a gun. Section 776.012(1), (2), clearly states where the danger of death, great bodily harm or the commission of a forcible felony is “imminent,” the use of deadly force is justified. The statute contains no warning requirement. See T.P. v. State, 117 So.3d 864, 866 (Fla. 4th DCA 2013) (quoting McWhorter v. State, 971 So.2d 154, 156 (Fla. 4th DCA 2007)) (“... [U]nder section 776.013, a person who is attacked is allowed to stand his or her ground and ‘meet force -with force.’ It appears that the new law places no duty on the person to avoid or retreat from danger, so long as that person is not engaged in an unlawful activity and is located in a place where he or she has a right to be. § 776.013(3), Fla. Stat. (2005) (Internal citation omitted).”).
As to the primary reason given by the court for rejecting Mobley’s “Stand Your Ground” defense — that Mobley did not see a weapon, this likewise cannot be deemed determinative. The record reflects that Mobley observed Jason viciously attack his friend Chico outside the Chili’s. Mobley then saw Jason’s friend Roly approach and reach under his shirt. It was then that Mobley became afraid for his safety and life and for that of his friend and he pulled his gun:
Q. Okay. So, as soon as he [Roly] was coming towards you, you shot?
A. Yes.
Q. Why did you first pull your firearm?
A. Why[?]
Q. Yes.
A. By this time, you know, I didn’t know what they had done — I didn’t know what Chico had got hit with, and it was so much blood, I freaked, I was scared and I seen [sic] this other guy coming up from the back.
*1166 And he reached up under his shirt. So, I was scared, I thought, they were going to shoot or kill us or stab us or something. So I was scared.
The shooting at issue did not occur in a vacuum. Mobley did not shoot two innocent bystanders who just happened upon him on a sidewalk. The record — as corroborated by a video of the events — is that (1) Mobley found himself in the middle of a ■violent, unprovoked attack on a companion who was standing right next to him, by one of two men who earlier had engaged in an altercation to which he was a witness; (2) after the initial violent attack on Mobley’s friend, the attacker immediately turned his attention to Mobley; (3) less than four seconds after that, the first attacker was joined by the second man involved in the altercation inside the restaurant; and (4) when the second man reached under his shirt after rushing up to join his companion who had not abandoned the field, Mob-ley believed the second man was reaching for a weapon to continue the attack. With these facts at hand, and with Mobley’s knowledge of these two assailants, the issue for determination was not whether Mobley knew a weapon was possible or whether he actually saw one, but whether a reasonably prudent person in those same circumstances and with the same knowledge would have used the force Mobley used.
Rather than applying the objective standard required, the court below instead focused on the events that transpired inside the Chili’s to entirely discount Mobley’s “expressed beliefs or intentions” about what occurred outside the Chili’s. The court found that because Mobley was not directly involved in the earlier altercation inside the restaurant between Chico and Jason/Roly, but had acted as peacemaker, he could not have feared for his own life during the events which happened later outside the restaurant. However the events that occurred inside the Chili’s are relevant only insofar as they provide the context for Mobley’s actions when the attack outside the restaurant occurred.
It may have been more prudent for Mobley and Chico to skitter to their cars and hightail it out of there when they had the chance; however, as even the State concedes and the court below recognized, Mobley and Chico had every right to be where they were, doing what they were doing and they did nothing to precipitate this violent attack. The only relevant inquiry was whether, given the totality of the circumstances leading up to the attack, the appearance of danger was so real that a reasonably cautious and prudent person under the same circumstances would have believed that the danger could be avoided only through the use of deadly force.
Because the preponderance of the evidence demonstrates that had the proper standard been applied, Mobley’s use of deadly force was justified, the motion to dismiss should have been granted. See Dennis v. State, 51 So.3d 456, 460 (Fla.2010) (confirming that, where a defendant claims immunity from prosecution under sections 776.012, 776.013 and 776.032, the court below must determine whether that defendant has shown by a preponderance of the evidence that the immunity attaches); Vino, 100 So.3d at 717 (“When a defendant invokes the statutory immunity, the trial court must hold a pre-trial eviden-tiary hearing to determine if the preponderance of the evidence warrants immunity.”).
In so holding, we are mindful that, under our standard of review which is akin to that applied to the trial court’s ruling on a motion to suppress, the trial court’s ruling comes to this court “clothed with a presumption of correctness and the court must interpret the evidence and reason *1167 able inferences and deductions derived therefrom in a manner most favorable to sustaining the trial court’s ruling.” See R.J.C. v. State, 84 So.3d 1250, 1254 (Fla. 4th DCA 2012) (quoting Terry v. State, 668 So.2d 954, 958 (Fla.1996)); Smith v. State, 719 So.3d 1018, 1021 (Fla. 3d DCA 1998) (same). Nevertheless, considering the entire record and reasonable inferences derived therefrom in a manner most favorable to the trial court’s ruling, we nonetheless find there is no basis to support the trial court’s decision to deny immunity in this case.
Petition granted.
SHEPHERD, C.J., concurs.

. Mobley testified that he was temporarily working two jobs to earn extra money because his wife, a school teacher, was soon to go on maternity leave following the birth of the couple’s second child.

. It is conceded that Mobley was properly licensed to carry a concealed firearm.

. The trial court expressly found that "[i]n accordance with Florida law, Mr. Mobley did not bring the firearm in to the Chili’s that night

. These events were corroborated by a number of witnesses and are not disputed.

. Alexandra Martinez, a server at the restaurant called by the State to testify, confirmed that Jason and Roly continued to be angry after the initial shouting match had ended and appeared to become angrier as the evening wore on.

. Ms. Martinez also observed this as did Roberto Londono, the bartender at the restaurant.

. The video recording confirms that Chico was wearing a coat and that most everyone else who appears on the recording was wearing either a sweat shirt or a long sleeved shirt.

. The third man walked to his car parked next to Chico’s and remained there until after the shooting occurred.

. According to Ms. Martinez, the man who went to Roly’s aid after he was shot took a knife with him when he left the restaurant.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).