# Third District Court of Appeal

## State of Florida

Opinion filed December 09, 2015.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D14-1608
Lower Tribunal No. 10-8071
_____

**Xavier Spires,**
Petitioner,

vs.

**The State of Florida,**
Respondent.

A Case of Original Jurisdiction – Prohibition.

Law Offices of Andrew Rier, P.A., and Daniel Tibbitt, for petitioner.

Pamela Jo Bondi, Attorney General, and Jeffrey R. Geldens, Assistant Attorney General, for respondent.

Before WELLS, SHEPHERD, and ROTHENBERG, JJ.

ROTHENBERG, J.

Xavier Spires ("the defendant") petitions this Court for a writ of prohibition

following the denial of his motion to dismiss the information charging him with

second degree murder with a firearm, aggravated assault with a firearm, possession of a firearm by a convicted felon, and tampering with a witness,[1] pursuant to sections 776.012 and 776.032 of the Florida Statutes, commonly referred to as the Stand Your Ground immunity statutes. We deny the petition on the merits as the trial court's factual findings are supported by competent substantial evidence, and we conclude that the trial court did not err by finding that the defendant failed to establish by a preponderance of the evidence that he is entitled to self-defense immunity.

The defendant does not dispute that he shot and killed the victim, Anthony White. However, he claims that he is immune from criminal prosecution under section 776.032 because he reasonably believed the force he used was necessary to prevent the imminent commission of a forcible felony (murder) against him by Mr. White. He, therefore, filed a motion to dismiss the charges based on the Stand Your Ground Law, and the trial court properly conducted an evidentiary hearing. See Dennis v. State, 51 So. 3d 456, 462-63 (Fla. 2010) (explaining that the appropriate procedural vehicle to raise immunity under section 776.032 is a pretrial motion to dismiss under rule 3.190(b), Florida Rules of Criminal Procedure, and

---

[1] Although the defendant filed his Stand Your Ground immunity motion on all four counts, it is clear that such immunity would not apply to the witness tampering charge where the alleged tampering occurred while the defendant was in jail awaiting trial on the homicide and related offenses. It is also questionable that Stand Your Ground would apply to the aggravated assault charge in this case.

2

for the trial court to then conduct an evidentiary hearing to consider the factual disputes); State v. Vino, 100 So. 3d 716, 717 (Fla. 3d DCA 2012) (holding that "[w]hen a defendant invokes the statutory immunity, the trial court must hold a pre-trial evidentiary hearing to determine if the preponderance of the evidence warrants immunity").

**Burden of Proof and Standard of Review**

In Bretherick v. State, 170 So. 3d 766, 775 (Fla. 2015), the Florida Supreme Court concluded that at a pretrial evidentiary hearing, the defendant bears the burden to prove by a preponderance of the evidence that he is entitled to Stand Your Ground immunity. In reviewing the trial court's order on a motion to dismiss claiming immunity under the statute, this Court must apply the same standard that applies in an appeal from an order denying a motion to suppress. Mederos v. State, 102 So. 3d 7, 11 (Fla. 1st DCA 2012); Hair v. State, 17 So. 3d 804, 805 (Fla. 1st DCA 2009). We, therefore, review the trial court's legal findings de novo and the trial court's factual findings for competent substantial evidence. Viera v. State, 163 So. 3d 602, 64 (Fla. 3d DCA 2015); Mederos, 102 So. 3d at 11; Darling v. State, 81 So. 3d 574, 577 (Fla. 3d DCA 2012) (applying the competent substantial evidence standard to review the trial court's determination as to whether entitlement to immunity was proven by a preponderance of the evidence).

3

The trial court's factual findings are presumed correct and may only be reversed if not supported by competent substantial evidence. Arauz v. State, 171 So. 3d 160, 161-62 (Fla. 3d DCA 2015); Mobley v. State, 132 So. 3d 1160, 1162 (Fla. 3d DCA 2015). Thus, this Court "must interpret the evidence and reasonable inferences and deductions derived therefrom in a manner most favorable to sustaining the trial court's ruling." Viera, 163 So. 3d at 604 (quoting Terry v. State, 668 So. 2d 954, 958 (Fla. 1996)).

**The Evidence**

The evidence was in sharp conflict. The defendant testified at the evidentiary hearing that although he and the victim had been friends for years, they had both been physically violent towards each other in the past, but they still remained friends. On the day before the shooting, the victim asked the defendant to steal a car for him, and when the defendant declined, the victim became angry and told the defendant that he had better not "come around the hood" because he was going to "bless [his] young ass," which the defendant understood to mean that if the victim showed up in the neighborhood, the victim would kill him. This threat was substantiated by text messages sent by the victim to the defendant, which were introduced at the hearing.

Despite this threat, the defendant testified that he returned to the area with his girlfriend, Shatara Bellamy, because that is where he generally hangs out. He

4

testified that while he was arguing with Shatara, the victim pulled up and jumped out of the car with his hand in his shorts and began walking towards the defendant. The defendant, who stated that although he was not armed and already knew what [the victim] was coming for," walked towards the victim "to tell him like chill." The victim, however, pulled out a gun, pointed it at the defendant and continued to approach the defendant. When the victim got within an arm's length away from the defendant, Tyra Maycock, who was in the car the victim had arrived in, said something to the victim. When the victim turned to look at Tyra, the defendant, who believed the victim intended to kill him, knocked the gun from the victim's hand, picked up the gun, closed his eyes, and started shooting. When he opened his eyes, he saw the victim running back to the car he had arrived in. The defendant ran back to Shatara's car, and while he was driving away, he fired several shots into the air as a warning to the victim's friends who lived in the apartment complex.

The defendant's girlfriend's testimony partially supported and partially conflicted with the defendant's testimony. Shatara testified that while she and the defendant were arguing, a car sped around the corner and into the parking lot where she and the defendant were, and the victim jumped out of the car carrying a gun in his hand. This conflicted with the defendant's testimony because he testified that when the victim got out of the car, he had his hand in his pocket, and

5

as they walked towards each other, the victim pulled out the gun. Shatara claimed that although the victim was pointing a gun at the defendant, she saw the defendant walk towards the victim, saw Tyra get out of the car and tell the victim "I didn't bring you around here for this shit," saw the defendant and victim "scuffling," and then she ducked her head. While her head was down, she heard five to six gunshots, and then she saw the victim run back to his car and the defendant run back to her car. Although the defendant claims he disarmed the victim, picked up the gun, shot the victim several times and continued to shoot the gun in the air as he drove off, Shatara testified that at no time did she see the defendant with a gun in his hands.

In contrast with Shatara's courtroom testimony, the State introduced evidence through the lead detective, Detective Jessica Alvarez, that when she initially interviewed Shatara, Shatara told her that she saw the victim pull up in a car and that she left shortly thereafter. Shatara told Detective Alvarez that she had left before the shooting. Detective Alvarez testified that she was not able to inquire further as Shatara told Detective Alvarez that she wished to terminate the interview because the defendant's attorneys told her not to speak to the police.

Tyra Maycock, who the victim was with when he was shot and killed by the defendant, also testified. Her testimony corroborated Shatara's initial statement to Detective Alvarez wherein Shatara told Detective Alvarez that she had left before

6

the shooting, which is in direct conflict with Shatara's subsequent testimony at the hearing where she claimed she was present during the shooting, as well as the defendant's version of the events. Tyra testified that she was with the victim that evening. They had visited the victim's grandmother, and on the way home, the victim asked Tyra to take him to see a friend at an apartment complex. When they arrived, they saw the defendant talking to a woman (Shatara) in the parking lot. The victim visited with two of his friends at the apartment complex. While the victim was visiting with his friends, Tyra watched the defendant walk over to some cars in the parking lot, and when he returned, she saw that he had a gun in his hand. The defendant, with gun in hand, walked over to Shatara's car, spoke to Shatara, and Shatara drove away. When the victim began walking back to Tyra's car, the defendant, with the gun still drawn, intercepted the victim and the two exchanged words. As the victim turned and began to walk to Tyra's car, the defendant pointed the gun at the victim and started shooting. The victim fled to the car, and with his legs hanging out of the passenger side, he told her "Babe, go." As she tried to leave, the defendant stepped in front of her car and pointed the gun at them through the front windshield. When the defendant approached her on the driver's side, she jumped out of the car and exclaimed "what the f—k!" In response, the defendant asked her if her son was in the car. He then apologized to her for shooting out the window of her car and told her he would pay for the

7

window. Tyra testified that the victim was unarmed; the victim did not initiate the confrontation; after the defendant and the victim argued, she saw the unarmed victim turn and begin walking back to her car; and as the victim was turning, she saw the defendant shoot the victim.

Detective Alvarez testified that the victim sustained four bullet holes to his back; fourteen casings, all shot from the same gun, were recovered on the scene; Tyra's car contained several bullet holes and the front driver's window was shot out; and no gunshot residue was found on the victim's body or clothing.

The record also reflects that while in jail in this case, the defendant called Tyra to try to convince her to change her testimony. Based on the contents of this recorded phone call, the State amended the information to include witness tampering charges. The trial court limited the State's use of this statement to impeachment of the defendant's testimony and as evidence of the defendant's state of mind relevant to his claim of self-defense, and based on that ruling, the tape was not introduced into evidence.

The portions of the defendant's recorded phone conversation introduced to impeach the defendant include the following. At the hearing, the defendant testified that after shooting the victim, he immediately returned to his car, and while driving off, he fired several warning shots into the air; and that he had no choice but to shoot the victim—that "it was either me or him"—and the defendant

8

denied speaking with Tyra that evening. However, the defendant was impeached with his recorded phone conversation with Tyra. When discussing the night of the shooting with Tyra on the phone, Tyra told the defendant that she still did not understand why he shot the victim. The defendant responded by telling her that was "why [I] came to the car and I told you damn my bad. If I would've knew you was there man shit wouldn't even never took place then and there." In that same phone conversation, the defendant repeated, "I came, I came to the car like when I realize you was there, I'm like man damn my bad, I ain't, I ain't even know you was there. If I would've knew you was there, I swear man none of that shit would've even took place, man." These statements are clearly inconsistent with the defendant's courtroom testimony where he adamantly denied speaking with Tyra at the scene of the homicide, and these statements conflict with the defendant's claim of self-defense and arguably show an intent to kill.

### The Trial Court's Ruling

The trial court concluded that the defendant failed to demonstrate by a preponderance of the evidence that he was entitled to statutory immunity under sections 776.012 and 776.032. Based on the conflict in the evidence, we affirm. The defendant claims he shot the victim in self-defense. He testified that the victim confronted him with a gun, and when the victim became momentarily distracted, the defendant knocked the gun from the victim's hand, closed his eyes

9

and just started firing at the victim. The defendant's testimony was in direct conflict with the testimony of Tyra Maycock, the physical evidence, the defendant's text messages to his brother the night before the homicide, the defendant's statements to Tyra at the scene of the homicide, and his subsequent recorded phone conversation with Tyra.

Tyra testified that the victim was unarmed when the defendant approached with a gun in his hand, and when the victim turned to get into Tyra's car, the defendant began shooting at the victim. Tyra testified that although the victim was able to get into the car, when she tried to drive away the defendant blocked her car and pointed the gun at them through the car's front windshield. Tyra jumped out of the car, and the defendant apologized for shooting up her car and told her he would pay for the damage.

The physical evidence reflects that the victim died from four gunshot wounds to his back. The defendant's recorded statements to Tyra after the shooting refute the defendant's claim of self-defense. Instead of telling Tyra that he shot the victim in self-defense, he told her that "[I]f I would've knew you was there man that shit wouldn't even never took place then and there." The State also introduced the defendant's text messages to his brother the night before the homicide, wherein the defendant informed his brother about his dispute with the victim and told his brother that he intended to "flip" the victim (which the

10

defendant stated at the evidentiary hearing means to "kill" in street talk), and that "this dude [will] get what he['s] looking for."

As the Florida Supreme Court stated in <u>Herzog v. Herzog</u>, 346 So. 2d 56, 57 (Fla. 1977), and this Court noted in <u>Vino</u>, 100 So. 3d at 719, so long as there is competent substantial evidence to support the trial court's findings, the reviewing court must yield. <u>See also</u> <u>Viera</u>, 163 So. 3d at 605 (affirming denial of Stand Your Ground immunity where there was conflicting testimony and competent substantial evidence contradicting Viera's version of the events); <u>Mederos</u>, 102 So. 3d at 11 (affirming denial of Stand Your Ground immunity where the testimony below "contradict[ed] wildly" and where there was competent substantial evidence that Mederos was not acting in self-defense when he stabbed the victim).

## <u>CONCLUSION</u>

Because the evidence was "wildly conflicting," <u>see</u> <u>Mederos</u>, 102 So. 3d at 11, and there was competent substantial evidence contradicting the defendant's claim of self-defense, we deny the defendant's petition without prejudice for the defendant to raise his claim of self-defense at trial.

Petition denied.