# Third District Court of Appeal

## State of Florida

Opinion filed March 26, 2025.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D24-1811
Lower Tribunal No. F23-22576
_____

**Pierce Nelson Hoempler,**
Petitioner,

vs.

**The State of Florida,**
Respondent.

A Case of Original Jurisdiction — Prohibition and Certiorari.

Carlos F. Gonzalez, P.A. and Carlos F. Gonzalez, for petitioner.

James Uthmeier, Attorney General, and Katryna Santa Cruz, Assistant Attorney General, for respondent.

Before SCALES, MILLER, and BOKOR, JJ.

MILLER, J.

In this hybrid petition, petitioner, Pierce Nelson Hoempler, seeks a writ of prohibition to prevent his further prosecution for three counts of second-degree murder and, alternatively, a writ of certiorari quashing two evidentiary rulings.[1]  In the prohibition aspect of the petition, Hoempler contends he is immune from prosecution pursuant to Florida's "Stand Your Ground" law, see section 776.032, Florida Statutes (2023), while in the certiorari portion, he claims the trial court departed from the essential requirements of law in refusing to admit a 911 recording into evidence and allowing testimony regarding an incident immediately preceding the homicides.  Finding no legal error and deferring to supported factual findings, as we must, we deny relief.

## I

Hoempler was arrested and charged with shooting and killing his neighbor, Hector Rivera, and Rivera's two adult sons, Frank and Jeremy, following a struggle that began in his front yard.  All three victims were unarmed at the time and succumbed to multiple gunshot wounds.  After he was charged, Hoempler filed a motion to dismiss asserting immunity from prosecution under sections 776.032 and 776.012, Florida Statutes (2023).

---

[1] Hoempler has since been indicted for the first-degree murder of Hector Rivera.

2

The trial court conducted a two-day hearing on the motion. Three witnesses testified on behalf of the State, and the prosecutor offered the recorded interviews of Rivera's two minor grandchildren. The defense did not present any witnesses and instead moved to admit the recording of a 911 call Hoempler made immediately following the shootings. In the 911 call, Hoempler asserted he shot the victims after he was "rushed." The State objected to the recording on the grounds that Hoempler's statements were self-serving and lacked spontaneity. The trial court deferred ruling.

The first prosecution witness, Laritza Cruz, was close friends with Rivera. She testified that Rivera and Hoempler lived in separate units in an apartment complex located near the supermarket where she worked. On the day of the shootings, she was walking home from work when she noticed Hoempler following her slowly on a bicycle. He followed her for some time and began verbally harassing her. He then threatened to retrieve a firearm and shoot her. Cruz walked briskly home and called Rivera to inform him of the incident.

The defense objected to Cruz's testimony, contending it was irrelevant and any probative value was outweighed by the prejudicial effect derived from the lethal nature of Hoempler's threat. The trial court agreed to consider the testimony for the limited purpose of establishing the chronology of events

3

leading up to the shootings. The court stated that it would not consider the threat as probative of the immunity analysis.

Rivera's two young grandchildren were in a vehicle with Rivera when he received the phone call from Cruz. The children overheard the conversation and noticed that Rivera became visibly upset. Rivera then drove to the apartment complex and knocked on Hoempler's front door. While the children waited nearby, the men verbally sparred and then physically engaged.

The second prosecution witness, Andrew Wint, testified that he lived next door to Hoempler. On the day of the shootings, he was working on a vehicle in his yard. He saw Rivera bang on Hoempler's front door. When Hoempler opened the door, Rivera angrily confronted him. The men engaged in a heated conversation and eventually began scuffling. At some point, Hoempler straddled Rivera and told him he did not wish to harm him but that he "could do something."

Rivera's two sons, Frank and Jeremy, arrived at the complex. Wint noticed that Hoempler had a handgun tucked in the back of his pants. He attempted to warn Frank and Jeremy, while simultaneously backing up slowly toward the front door of his apartment. Frank and Jeremy walked

4

around Hoempler to reach their father, and Rivera got up off the ground. He was upset and cursing under his breath.

Hoempler removed his firearm from the back of his pants and brandished it in the air. Wint recounted that the three victims "distanced from [Hoempler]" upon seeing the weapon. From his perspective, Frank was not close enough to touch Hoempler, and Jeremy was "all the way to the sidewalk."

Concerned for the safety of his family, Wint ran into his apartment. He then heard a series of rapid gunshots. After the initial burst, the shots paused for approximately thirty seconds. Wint heard Hoempler say, "you see what you guys let me did." This statement was soon followed by a final shot.

Hoempler called 911 and reported that three men were "down." Upon questioning by the operator, he stated he shot the men after they "rushed" him. He added that one appeared to be dying.

Yet a third prosecution witness, Associate Medical Examiner Dr. Nicholas Barna, testified that all three victims sustained multiple gunshot wounds. Body camera footage from the responding officers established that the victims' bodies were several yards away from each other in the courtyard of the apartment complex. Dr. Barna opined that the wounds inflicted on Frank and Jeremy were potentially consistent with them turning their backs

5

during the shooting and then falling to the ground as they were injured. Rivera had several fresh abrasions on his face and arms consistent with falling or collapsing to the ground. He also had bruises on his forehead and right cheek consistent with blunt force injury. He sustained six total gunshot wounds, including a gunshot wound on his scalp and ear, two gunshot wounds to his back, and one to his buttock. As no soot or stippling was present on the body, the range of gunfire was "distant or indeterminate." Rivera and Jeremy died at the scene, while Frank died later in the hospital.

At the conclusion of the hearing, the trial court rendered a detailed, fact-intensive, twelve-page order denying the immunity motion. In the order, the court stated that it "did not consider" the 911 recording because "[t]he evidence shows that the victims never rushed at the defendant." It explained its reasoning as follows:

> Based on the evidence presented . . . a reasonable and prudent person would not have used deadly force if situated in the same circumstances as the defendant. The physical and testimonial evidence shows Hector [Rivera], Jeremy and Frank were all at a distance when the defendant shot them, and in the act of turning or running away, not rushing at the defendant. The physical and testimonial evidence shows that none of the three victims were armed. They did not threaten the defendant's life verbally or physically. The defendant was not stopping the commission of a forceable felony against himself. There was no imminent threat to the defendant's life during the first set of shots. There certainly was no threat when Hector [Rivera] was lying on the ground with multiple gunshot wounds, and the defendant fired his final killing shot.

6

This petition followed.

II

A

We apply a mixed standard of review in assessing whether a criminal defendant is immune from prosecution.  We review the trial court's legal conclusions de novo, while we review its findings of historical facts for competent, substantial evidence.  See Bouie v. State, 292 So. 3d 471, 479 (Fla. 2d DCA 2020).  As to the evidentiary rulings, certiorari "is warranted when a nonfinal order: (1) cannot be remedied on postjudgment appeal, (2) results in material injury for the remainder of the case, and (3) departs from the essential requirements of law."  A.H. v. Dep't of Child. & Fams., 277 So. 3d 704, 707 (Fla. 3d DCA 2019).

B

Section 776.032(1) provides in pertinent part, "A person who uses or threatens to use force as permitted in s. 776.012, s. 776.013, or s. 776.031 is justified in such conduct and is immune from criminal prosecution . . . ."  Section 776.012(2), in turn, provides,

> A person is justified in using or threatening to use deadly force if he or she reasonably believes that using or threatening to use such force is necessary to prevent imminent death or great bodily harm to himself or herself or another or to prevent the imminent commission of a forcible felony.  A person who uses or threatens to use deadly force in accordance with this subsection does not

7

have a duty to retreat and has the right to stand his or her ground if the person using or threatening to use the deadly force is not engaged in a criminal activity and is in a place where he or she has a right to be.

The State bears the burden of overcoming a prima facie claim of Stand Your Ground immunity by clear and convincing evidence. § 776.032(4), Fla. Stat.

Courts measure the conduct of a person acting in self-defense by an objective standard. See State v. Quevedo, 357 So. 3d 1249, 1253 (Fla. 3d DCA 2023). "That standard requires the court to determine whether, based on circumstances as they appeared to the defendant when he or she acted, a reasonable and prudent person situated in the same circumstances and knowing what the defendant knew would have used the same force as did the defendant." Mobley v. State, 132 So. 3d 1160, 1164–65 (Fla. 3d DCA 2014). Stated differently, "a person in the exercise of his right of self-defense may use only such force as a reasonable person, situated as he was and knowing what he knew, would have used under like circumstances." Toledo v. State, 452 So. 2d 661, 663 (Fla. 3d DCA 1984) (citation, emphasis, and quotation marks omitted).

Against these principles, we examine the instant case. We agree with the defense that the 911 recording qualified for admission as either an excited utterance or spontaneous statement. See Thompson v. State, 247 So. 3d 706, 708–10 (Fla. 3d DCA 2018) (holding 911 calls were admissible

8

as either spontaneous statement or excited utterance); Barron v. State, 990 So. 2d 1098, 1101 (Fla. 3d DCA 2007) (same); Laflipe v. State, 888 So. 2d 104, 105 (Fla. 3d DCA 2004) (noting excited utterances must not necessarily occur within a "definitive time" but instead the speaker must remain "in an excited state"). But we disagree with the proposition that the trial court erroneously refused to admit the exhibit. A careful review of the order under review demonstrates that the trial court considered the call. The court simply refused to assign any weight to Hoempler's explanation for the shooting because it concluded his version was contradicted by the forensic and testimonial evidence. See Bearden v. State, 161 So. 3d 1257, 1263 (Fla. 2015) ("Once the evidence is admitted, the [factfinder] decides whether it is credible."). This decision does not lend itself to certiorari relief. See Williams v. Nuno, 239 So. 3d 153, 155 (Fla. 3d DCA 2018) ("[A] trial court's factual determinations, including credibility determinations, are ordinarily not disturbed on appeal.").

Further, the court did not factor in the earlier threat Cruz attested to into the immunity analysis. Instead, it carefully circumscribed any consideration of the earlier encounter as pertinent to contextualizing Rivera's arrival on Hoempler's doorstep. This ruling cannot be deemed a deviation from established law. See Darling v. State, 81 So. 3d 574, 578 (Fla. 3d DCA

9

2012) ("[E]vidence that is inextricably intertwined with the crimes charged is admissible . . . where it is impossible to give a complete and intelligible account of the crime charged without referring to the other crime.") (quoting Monestime v. State, 41 So. 3d 1110, 1112 (Fla. 3d DCA 2010)) (omission in original); Morlas v. State, 211 So. 3d 286, 291 (Fla. 4th DCA 2017) (holding evidence of a car chase in a burglary case was "part of a continuing chain of chronological events," and therefore "relevant and admissible as inextricably intertwined evidence"); Sanders v. State, 254 So. 3d 1038, 1041–42 (Fla. 4th DCA 2018) (finding evidence of another shooting introduced to show complete sequence of events and police reason for appearing at appellant's door was properly admitted); Charles v. State, 223 So. 3d 318, 326 (Fla. 4th DCA 2017) (holding trial court did not abuse its discretion admitting evidence showing "a chronological chain of events" that led to appellant's capture with bag relevant to charged crimes).

Finally, although the petition raises persuasive arguments as to the credibility of witnesses, "[i]n conducting its review, an appellate court must restrain itself from the natural human impulse to consider that its own view of the facts is superior to that of a trial judge." State v. Vino, 100 So. 3d 716, 719 (Fla. 3d DCA 2012). Absent legal error, "[s]o long as there is competent

substantial evidence to support the findings made by the judge who was on the scene, the reviewing court must yield." Id.

Here, the findings in the order under review are well-supported by the testimony and other evidence of record. See Levy v. Donnenfeld, 338 So. 3d 395, 396 (Fla. 3d DCA 2022) ("[T]he trial court alone has the authority to render credibility determinations . . . ."); Mack v. State, 231 So. 3d 578, 579 (Fla. 1st DCA 2017) ("Witness credibility determinations are not properly reviewed by this court on appeal."); Finkelstein v. State, 157 So. 3d 1085, 1087 (Fla. 1st DCA 2015) ("This Court will not re-weigh the evidence considered by the trial court, nor will we disturb the trial court's determination of credibility of the witnesses."). "The fact that there is competing evidence in the record . . . does not change our analysis under a substantial competent evidence standard." Yacht Club by Luxcom, LLC v. Vill. of Palmetto Bay Council, 316 So. 3d 748, 751 (Fla. 3d DCA 2021). Accordingly, we are constrained to deny the petition because we find no basis for relief in prohibition or certiorari.

Petition denied.